UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| OFFICEMAX INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-10-110-B-W |
| | ) | |
| COUNTY QWICK PRINT, INC., | ) | |
| d/b/a/ CQP OFFICE SOLUTIONS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

The Court denies OfficeMax Incorporated's (OfficeMax) motion for temporary restraining order, concluding that although a noncompetition agreement may be assigned with the consent of the employee to a successor business and may be assumed upon merger by another successor business, OfficeMax failed to establish that immediate enforcement of the agreement is necessary to avoid irreparable harm, that the balance of equities favors immediate injunctive relief, and that the public interest would benefit from such an order.

**I.      STATEMENT OF FACTS**

**A.      Procedural History**

On March 18, 2010, OfficeMax filed a complaint for a temporary restraining order (TRO), injunctive relief, and damages against County Qwik Print, Inc. (County), David A. Levesque, and Dana Rattray for alleged violations of Confidential Information and Noncompetition Agreements and of the Maine Uniform Trade Secrets Act.[1] *Compl.* (Docket # 1).  On March 19,

---

[1] OfficeMax is incorporated under the laws of the state of Delaware with a principal place of business in Naperville, Illinois; David Levesque is a resident of Caribou, Maine; Dana Rattray is a resident of Fort Fairfield, Maine; and, County Qwik Print, Inc. is incorporated under the laws of the state of Maine with a principal place of business in Caribou, Maine.  *Compl.* ¶¶ 1-5.  OfficeMax asserts the Court's jurisdiction under 28 U.S.C. § 1332, since there is complete diversity and the amount in controversy exceeds $75,000.

2010, OfficeMax moved for a TRO and a preliminary injunction, *Pl.'s Mot. for TRO and Preliminary Inj.* (Docket # 6) (*Pl.'s Mot.*), and on April 2, 2010, OfficeMax moved for *ex parte* consideration of the motion for TRO. *Pl.'s Mot. for* Ex Parte *Consideration of its Mot. for TRO* (Docket # 11).[2]  On April 5, 2010, counsel entered their appearance on behalf of County, Mr. Levesque, and Mr. Rattray and the next day, Magistrate Judge Rich held a telephonic conference and as regards the pending motion for TRO, ordered that the Defendants file a response to the motion no later than April 15 and OfficeMax to file any reply by April 16.  *Report of Hearing and Order Re:  Scheduling* (Docket # 15).  The Magistrate Judge further ordered that once the Court reviewed the completed papers, it would decide whether the hearing on the motion would be evidentiary and would schedule a hearing as the court's calendar permitted.  *Id.*

On April 13, 2010, the Defendants moved to dismiss the Complaint and on April 15, 2010, they responded to the motion for preliminary injunction.  *Defs.' Mot. to Dismiss Pl.'s Compl. for TRO, Injunctive Relief, and Damages* (Docket # 16, 17) (*Defs.' Mot. to Dismiss*); *Defs.' Opp'n to Pl.'s Mot. for TRO and Preliminary Inj.* (Docket # 18) (*Defs.' Opp'n*).  On April 16, 2010, OfficeMax replied to the Defendants' Response to the motion for TRO.  *Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for TRO and Preliminary Inj.* (Docket # 19) (*Pl.'s Reply*).

---

[2] On April 30, 2010, the Court held a telephone conference of counsel to determine how they wished to proceed. Now pending are motions for a temporary restraining order, for *ex parte* consideration of the motion for temporary restraining order, for preliminary injunction, and for dismissal.  The time for response to the Defendants' motion to dismiss has not run, and the Defendants' motion is not yet in order.  The parties asked the Court to rule on the pending motion for TRO based on their memoranda and sworn declarations.  The Court agreed to do so.

This context avoids the question of whether there is any remaining difference between a TRO and a preliminary injunction once the opposing party has entered an appearance and has been fully heard.  *Graham v. Minter*, 437 F.2d 427, 428 (1st Cir. 1971); *Saco Def. Sys. Div., Maremont Corp. v. Weinberger*, 606 F. Supp. 446, 449 (D. Me. 1985).  The Court is aware that its Order on the motion for TRO may be followed in fairly short order by a more complete hearing, perhaps including evidence, on the merits of the motion for preliminary injunction, and, in evaluating the merits of the motion, the Court has considered whether OfficeMax has made its case for the need for urgent relief.  The Court will confer with counsel to determine how they wish to proceed with the remaining motions, including the motion for preliminary injunction.

B.      OfficeMax's Allegations

On February 9, 1996, Boise Cascade Office Products Corporation (BCOP) purchased the stock of Loring, Short and Harmon, Inc. (LS&H), and OfficeMax is the successor in interest by merger to the property and assets of BCOP.  *Compl.* ¶ 1.  David A. Levesque of Caribou, Maine began working for LS&H in 1982 and by 1996, he was employed as a Business Relationship Manager.  *Id.* ¶¶ 4, 8.  Dana Rattray of Fort Fairfield, Maine, began working for LS&H on August 31, 1987, and by 1996, he was also employed as a Business Relationship Manager.  *Id.* ¶¶ 5, 17.  On February 7, 1996, Mr. Levesque and Mr. Rattray executed a Confidential Information and NonCompetition Agreements under which they agreed that for twelve months following termination of employment:  I "will not, either for my own purposes or as an employee of or for the benefit of any other entity or person in a capacity that directly or indirectly includes responsibility for developing and maintaining customers relationships, engage in the sale or distribution of office supplies, office furniture, or related office products or services, engage in the sale of janitorial supplies, or otherwise engage in the type of work that I perform for LS&H within sixty (60) miles of any county in which I performed services for LS&H in the 12 months prior to my termination, of employment."  *Id.* ¶¶ 8, 9, 17, 18.

Mr. Levesque and Mr. Rattray continued working for BCOP after it purchased LS&H and continued working for OfficeMax after it purchased BCOP.  As Business Relationship Manager for OfficeMax, Mr. Levesque and Mr. Rattray acted as "the face of OfficeMax to its corporate and organizational customers and prospective customers by soliciting and selling office supplies and related products and services to customers, by establishing customer trust and goodwill, and by maintaining personal relationships with key procurement and purchasing managers in order to maintain and develop OfficeMax's customer relationships."  *Id.* ¶¶ 10, 19.

Further, while employed at OfficeMax, Mr. Levesque was exposed to "an extensive amount of OfficeMax information that is highly confidential and should not be revealed to competitors" and he "gained unique insights into the corporate and organizational clients he solicited and served." *Id.* ¶¶ 11, 12, 20, 21. OfficeMax says that due to a reorganization of the company, Mr. Levesque's last day of employment with OfficeMax was November 23, 2009. *Id.* ¶ 14. As a result of this reorganization, OfficeMax offered Mr. Rattray a position of continued employment as a Business Development Manager, which he accepted in late 2009. *Id.* ¶ 23. On January 25, 2010, Mr. Rattray resigned from OfficeMax effectively immediately. *Id.* ¶ 24.

Since on or about December 31, 2009, County has done business as CQP Office Solutions and has competed with OfficeMax in the office supply, office furniture, copier services, and related business in Aroostook County, Maine. *Id.* ¶ 3. After their employment with OfficeMax ended, Mr. Levesque and Mr. Rattray began working and have continued to work for County, soliciting customers, and competing against OfficeMax, using the knowledge of OfficeMax's confidential information they acquired during their OfficeMax employment. *Id.* ¶¶ 15, 16, 25, 26.

The OfficeMax Complaint against County, Mr. Levesque and Mr. Rattray contains three counts: Count I is a breach of contract claim against Mr. Levesque, Count II is a breach of contract claim against Mr. Rattray, and Count III is a Trade Secrets Act claim against County, Mr. Levesque, and Mr. Rattray. *Id.* ¶¶ 27-46.

C.    **The Defendants' Response**

County, Mr. Levesque, and Mr. Rattray agree that in February 1996, just before the BCOP purchase, LS&H presented Mr. Levesque and Mr. Rattray with a Confidential Information and Noncompetition Agreement and that they each signed it. *Defs.' Opp'n* at 1-2.

4

They say they understood the agreement was "in contemplation of LSH's anticipated transaction with BCOP" and if BCOP completed its purchase of LS&H, BCOP would offer each a job. *Id.* at 2. If that happened and if BCOP wanted to prohibit them from competing, BCOP would then require them to sign another noncompetition agreement with BCOP as their employer. *Id.* They contend that the LS&H Confidential Information and Noncompetition Agreement did not apply to their subsequent employment with BCOP. *Id.*

The LS&H transaction was completed and Mr. Levesque and Mr. Rattray were required to file employment applications with BCOP. *Id.* BCOP accepted their applications and required them to execute employment agreements, which did not contain any noncompetition provisions. *Id.* When BCOP merged with OfficeMax, Mr. Levesque and Mr. Rattray were presented with employment offers with OfficeMax, which they each accepted. *Id.* at 3. They each signed new offers of employment, which did not contain noncompetition provisions. *Id.* Mr. Levesque and Mr. Rattray remained employed with OfficeMax through the fall of 2009, but as a result of a reorganization of the company, OfficeMax terminated both of them. *Id.* Three weeks after termination, OfficeMax offered Mr. Rattray a different position and he was given another written offer of employment, which did not contain a noncompetition agreement. *Id.* Mr. Rattray remained employed at OfficeMax until January 25, 2010. *Id.* Mr. Levesque and Mr. Rattray say that upon leaving OfficeMax, neither of them retained any price lists, customer lists, or other OfficeMax documents relating to sales or customers. *Id.*

### D.     OfficeMax's Reply

In its Reply, OfficeMax asserted that "[t]he silence of Defendants' Opposition brief and accompanying papers was deafening concerning the central issue at hand, as Defendants' *did not deny* that they are directly competing against OfficeMax for the identical customers that they

called upon and served for OfficeMax over the course of many years in Aroostook County, Maine." *Pl.'s Reply* at 1 (emphasis in memorandum).   OfficeMax points out that the 1996 Noncompetition Agreement provides:

> I understand that Boise Cascade Office Products Corporation ("BCOP") plans to purchase the stock of LORING, SHORT & HARMON, INC. ("LS&H").   I execute this Agreement in contemplation of that transaction, knowing that LS&H is tendering the consideration **on behalf of BCOP** and **intending that my obligations, duties, and promises in this Agreement are for the benefit of BCOP** and in the expectation that I will be offered, and if offered I will accept, employment with BCIP after the closing of the transaction.

*Id.* at 2 (emphasis in memorandum).   Further, OfficeMax says that Mr. Levesque and Mr. Rattray were paid an extra $2,500.00 in 1996 for entering into this agreement.   *Id.* at 2.   Finally, OfficeMax highlights another provision:

> I agree that this Agreement shall be freely assignable by LS&H to BCOP in the event of and upon the closing of the sale of stock of LS&H to BCOP.

*Id.* at 3.

## II.    DISCUSSION

### A.    Legal Standards

To determine whether to issue a temporary restraining order, the Court applies the same four-factor analysis used to evaluate a motion for preliminary injunction.   *Northwest Bypass Group v. United States Army Corps of Eng'rs*, 453 F. Supp. 2d 333, 337 (D.N.H. 2006).   The movant must demonstrate the following:

(1) it will likely succeed on the merits;

(2) it will suffer irreparable harm if the injunction is denied;

(3) the harm it will suffer outweighs any harm to [the defendant] that would be caused by injunctive relief; and,

(4) the effect on the public interest weighs in its favor.

6

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006); *Kelly Servs., Inc. v. Greene*, 535 F. Supp. 2d 180, 183 (D. Me. 2008).  A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948, pp. 129-30 (2d ed. 1995) (emphasis added in opinion)).  To support or oppose a motion for injunctive relief, "the parties must present '[e]vidence that goes beyond the unverified allegations of the pleadings . . . .'" *Kelly Servs.*, 535 F. Supp. 2d at 181, n.1 (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §2949 (2d ed. 1995)).  Here, the parties have presented affidavits in support of their respective positions.

**B.     Likelihood of Success**

The "sine qua non of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004) (citation omitted).  Under Maine law, noncompetition agreements are "contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue."  *Lord v. Lord*, 454 A.2d 830, 834 (Me. 1983).  Whether a noncompetition agreement is reasonable "is a question of law to be determined by the court."  *Chapman & Drake v. Harrington*, 545 A.2d 645, 647 (Me. 1988) (citations omitted).  The reasonableness of a specific covenant must be determined by the facts developed in the case as to its duration, geographic area, and the interests sought to be protected. *Id.*

The Defendants argue that OfficeMax is not likely to succeed on the merits because the 1996 noncompetition agreement with LS&H has been supplanted and subsumed by subsequent employment contracts with BCOP and OfficeMax. *Defs.' Opp'n* at 4-5. They contend that the last employment contracts they signed with OfficeMax are the operative documents and they contain no provision against post-employment competition with OfficeMax. *Id.* at 5. Further, the Defendants argue that noncompetition provisions are generally non-assignable. *Id.* at 5-6. OfficeMax replies that the 1996 LS&H agreement was expressly made for the benefit of BCOP and that the Agreements expressly allow for assignment from LS&H to BCOP. *Pl.'s Reply* at 3.

The parties have raised a narrow question: whether a noncompetition provision in an employment contract is assignable to a successor employer. The parties have not cited any Maine or First Circuit law on point and the Court has found none.[3] However, courts around the Country have split on the question, sometimes resolving the issue based on nuanced distinctions. *See Sogeti USA LLC v. Scariano*, 606 F. Supp. 2d 1080, 1082-87 (D. Ariz. 2009); *Enforceability, by purchaser or successor of business, of covenant not to compete entered into by predecessor and its employees*, 12 A.L.R. 5th 847 (1995).

A review of Maine law on noncompetition agreements and the assignment of contracts is in order. Under Maine law, noncompetition agreements are "contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue." *Lord*, 454 A.2d at 834. "The reasonableness of a noncompetition covenant is a question of law that must be determined by the facts developed in each case as to its duration, geographic area, and the interests sought to be protected." *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995); *Wausau Mosinee Paper Corp. v. Magda*, 366 F. Supp. 2d

---

[3] None of the agreements contains a choice of law provision. *Compare Kelly Servs.*, 535 F. Supp. 2d at 184. The parties assume and the Court agrees that Maine law controls. A federal court looks to the substantive law of the forum state when sitting in diversity. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

212, 220 (D. Me. 2005).  Protecting an employer from business competition "is not a legitimate business interest to be advanced by such an agreement."  *Id.*; *Chapman & Drake*, 545 A.2d at 647.  Maine law distinguishes between noncompetition agreements and restrictive covenants, and requires durational limits for noncompetition agreements, but not for restrictive covenants.  *Bernier v. Merrill Air Eng'rs*, 2001 ME 17, ¶ 18, 770 A.2d 97, 103.  The Maine Supreme Court has stated that a "covenant not to compete may be reasonable . . . when the employee during his term of employment has had substantial contact with his employer's customers and is thereby in a position to take for his own benefit the good will his employer paid him to help develop for the employer's business." *Chapman & Drake*, 545 A.2d at 647.  Thus, a covenant not to compete may be reasonable "when the employee . . . has had access to his employer's confidential information, including customer lists, and is in a position after leaving his employer to take advantage of that information."  *Id.*

In general, Maine law allows a contract to be assigned.  "A contractual right can be assigned unless the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract."  *Goldberg Realty Group v. Weinstein*, 669 A.2d 187, 191 (Me. 1996) (citation omitted); *Chadwick-BaRoss v. Martin Marietta Corp.*, 483 A.2d 711, 715 (Me. 1984) (quoting *Restatement (2d) of Contracts* § 317(2)(a)).  For an assignment to be enforceable there must be "an act or manifestation by the assignor indicating the intent to transfer the right of the assignee."[4]  *Sturtevant v. Town of Winthrop*, 1999 ME 84, ¶ 11, 732 A.2d 264, 267.  For an assignment to be effective, however, "it need not be in writing."  *Id.* ¶ 34, 732 at 272 (Dana, J., dissenting).  But, "to constitute an assignment there must be a manifestation of an intention by

---

[4] In their motion to dismiss, the Defendants assume that LS&H assigned the noncompetition agreements to BCOP.  *Defs.' Mot. to Dismiss* at 6 n.5.

the assignor to relinquish control of the right assigned and to appropriate that right to the assignee." *Shiro v. Drew*, 174 F. Supp. 495, 498 (D. Me. 1959).

Against the general rule favoring assignments, however, Maine law carves out an exception for "[a]n executory contract for personal services, or a contract otherwise involving personal credit, trust, or confidence." *Salmon Lake Seed Co. v. Frontier Trust Co.*, 130 Me. 69, 74, 153 A. 671, 673 (1931). These contracts "cannot be assigned by the sole act of one of the parties thereto." *Id.*; *Goldberg Realty*, 669 A.2d at 191. Maine law defines a personal services contract as one involving the "exercise of individual skill and judgment, which can be performed only by the person named." *Pinkham v. Libbey*, 93 Me. 575, 577, 45 A. 823, 824 (1900). A contract to plow snow may not be a personal services contract, but a contract to build a home "unquestionably" is. *Compare Sturtevant*, 1999 ME 84, ¶ 34, n.10, 732 A.2d at 274, (Dana, J., dissenting) (stating that the court "concluded that a snowplowing contract is not a service that involves a type of personal service, trust, or confidence that would require the Town's consent"); *with Craft Works Constr. v. Nest*, Civil Action Docket No. RE-03-12, 2003 Me. Super. LEXIS 223, at *4 (Me. Super. Nov. 14, 2003) (stating that "[a] contract to build a home is unquestionably a contract for personal services which entails trust and confidence in the builder"). "An example of a personal service contract is where an artist is engaged to paint a portrait – this type of contract cannot be assigned because it involves the unique talents of the artist and assigning the contract affects the adequacy of the product bargained for." *Katahdin Ins. Group v. Elwell*, Civil Action Docket No. CV-00-198, 2001 Me. Super. LEXIS 180, at *9 n.1 (Me. Super. Jul. 9, 2001) (citing *Motel Services v Central Maine Power Co.*, 394 A.2d 786,

789 (Me. 1978)).   The Court assumes that sales work, dealing directly with a business's customers, could constitute a personal services contract within the Maine definition.[5]

Even so, it is not entirely clear that the Maine restriction against unilateral assignment of a personal services contract extends to noncompetition agreements.   In *Katahdin Insurance*, a Maine Superior Court Justice drew a distinction between a personal service contract, such as where an artist is hired to complete a portrait, and an agreement not to compete, where the person only agrees "to abstain from certain activities."   2001 Me. Super. LEXIS 180, at *10 n.2; *Managed Health Care Assocs. v. Kethan*, 209 F.3d 923, 929-30 (6th Cir. 2000); *Equifax Servs. Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (stating that "[a]lthough an employee's duty to perform under an employment contract generally is not delegable, . . . the right to enforce a covenant not to compete generally is assignable in connection with the sale of a business").   He concluded that "although an employee's duty to perform under an employment contract generally is not delegable, a covenant not to compete generally is assignable."   *Katahdin Ins.*, 2001 Me. Super. LEXIS 180, at *10 n.2.   Although the Maine Supreme Judicial Court has not directly addressed the issue, the *Katahdin Insurance* case suggests that Maine might not restrict the assignability of covenants not to compete.

In this case, however, it is OfficeMax's position that Mr. Levesque and Mr. Rattray actually signed an agreement allowing for the assignment of the covenant not to compete.   To the extent states limit the assignment of noncompetition agreements, they commonly address whether such a covenant is assignable without the employee's consent, not with consent.   *See*

---

[5] In *HD Supply Facilities Maint., Ltd. v. Bymoen*, 210 P.3d 183, 185 n.1 (Nev. 2009), the Nevada Supreme Court imbues the "personal" aspect of noncompetition agreement with a slightly different meaning.  The Maine definition of a "personal service" contract focuses on the employee and whether his or her service represents the "exercise of individual skill and judgment." *Pinkham*, 45 A. at 824.   In *HD Supply*, the Nevada Supreme Court wrote that a noncompetition covenant is considered "personal" to the employee "since deciding whether to refrain from competition with an employer after termination is based on an individualized assessment of that particular employer's 'character and personality.'" 210 P.3d at 185 n.1.  In Maine, the focus is on the employee; in Nevada, on the employer or, more precisely, on the employee's view of the employer.

*Sogeti*, 606 F. Supp. 2d at 1082 (framing the question as to the assignability of restrictive covenants absent employee's express consent); *Katahdin Ins.*, 2001 Me. Super. LEXIS 180, at *11 (stating that "because non-compete provisions are freely assignable and Elwell expressly consented to the assignment of her employment contract, the contract was effectively assigned"); Adam Schneid, Note, *Assignability of Covenants Not To Compete:  When Can A Successor Firm Enforce A Noncompete Agreement?*, 27 Cardozo L. Rev. 1485, 1485 (2006) (stating that "[c]ourts generally enforce the assignment of a covenant not to compete that expressly permits assignment to a purchaser.  However, the validity of an assignment of a covenant not to compete that does not address assignability generates controversy in American courts") (footnotes omitted).

OfficeMax points to language in the two noncompetition agreements to press its contention that Mr. Levesque and Mr. Rattray agreed to assign the covenant not to compete.  The assignment language in the LS&H noncompetition agreement is found in paragraph 6:

> Assignment.  I agree that this Agreement shall be freely assignable by LS&H to BCOP in the event of and upon the closing of the sale of stock of LS&H to BCOP.  I further agree that if requested by BCOP, and for the consideration stated above, I will sign a noncompetition agreement in substantially the same form as this Agreement and which names BCOP as the employer.

*Pl.'s Mot.* Attach. 1, 2 at 2.  The Agreement also contains a preamble:

> I understand that [BCOP] plans to purchase the stock of [LS&H].  I execute this Agreement in contemplation of that transaction, knowing that LS&H is tendering the consideration on behalf of BCOP and intending that my obligations, duties, and promises in this Agreement are for the benefit of BCOP and in the expectation that I will be offered, and if offered I will accept, employment with BCOP after the closing of the transaction.  In consideration of the sum of $2,500, which has been paid to me by LS&H, I agree to the following:

*Id.* at 1.  The Court readily concludes that, in signing these agreements, Mr. Levesque and Mr. Rattray knew that the purpose of the Agreements was to bind them not to compete with BCOP.

There is, in the Court's view, no other reasonable interpretation.  The Court further concludes that Maine's policy against noncompetition covenants would not prohibit an employee, who is hired by the assignee employer, from agreeing not to compete with the assignee employer or prevent an assignee employer from enforcing the agreement.

The Defendants contend that the 1996 agreements contemplate that BCOP would present them with another contract, which included a covenant not to compete, that BCOP failed to do so, and therefore they are not bound by the noncompetition restriction.  As quoted above, paragraph six of the Agreement provides that "if requested by BCOP," they "will sign a noncompetition agreement in substantially the same form as this Agreement and which names BCOP as the employer."  *Pl.'s Mot.* Attach. 1, 2, at 2.  The Court does not view this contingent clause as requiring a new Agreement in order to maintain enforceability.

Finally, the Defendants say that they were presented with employment contracts by both BCOP and by OfficeMax, that they signed the contracts, and that the contracts did not contain noncompetition agreements.  *Defs.' Opp'n* at 5.  The contention is that the new employment contracts took the place of the LS&H noncompetition agreement and that OfficeMax has no right to sue under the provisions of agreements that have been subsumed by later agreements.  *Id.*  At least for purposes of the motion for temporary restraining order, the Court is not convinced.  The "agreements" that the Defendants have attached to their response are not comprehensive employment contracts.  *Id.* Attach. 2, 3, 4, 6, 7, 8.  They are commitment letters, specifying only the essential terms of an offer and acceptance of employment.  The Court does not view these documents are superseding and replacing the earlier Agreement.

The Court concludes that OfficeMax has demonstrated a reasonable likelihood of success in its claim that the February 7, 1996 covenants not to compete were enforceable by BCOP against Mr. Levesque and Mr. Rattray.

This does not end the discussion. The LS&H agreement clearly provides that the noncompetition provision is assignable to BCOP, but it fails to mention OfficeMax. The next question is whether OfficeMax as the corporate successor to both LS&H and BCOP can enforce the noncompetition clause in the LS&H Agreement. Unlike the BCOP assignment, OfficeMax has made no showing that either Mr. Levesque or Mr. Rattray anticipated that OfficeMax would be the beneficiary of their 1996 Agreement.

OfficeMax has established that it acquired BCOP by merger. *Pl.'s Reply*, Attach. 3. In their motion to dismiss, the Defendants rely on *Traffic Control Services, Inc. v. United Rentals Northwest, Inc.*, 87 P.3d 1054, 1057-59 (Nev. 2004) as holding that "because a non-competition provision is personal in nature, such contracts are unassignable as a matter of law if the employee does not consent thereby." *Defs.' Mot. to Dismiss* at 7. However, just last year, the Nevada Supreme Court explained en banc that *Traffic Control* involved an asset sale, not a merger:

> The United States District Court for the District of Nevada has certified, under NRAP 5, three questions concerning "[w]hether the Nevada rule stated in [*Traffic Control*], that 'absent an agreement negotiated at arm's length, which explicitly permits assignment and which is supported by separate consideration, employee [noncompetition] covenants are not assignable,' applies when a successor corporation acquires a non-competition covenant [, or a covenant of nonsolicitation or confidentiality,] as a result of a merger?" We answer these questions in the negative and clarify that *Traffic Control*'s rule of nonassignability does not apply when a successor corporation acquires restrictive employment covenants as the result of a merger.

*HD Supply*, 210 P.3d at 183-84. The *HD Supply* Court observed that "[a]s the majority of courts have concluded when considering this issue, in a merger, the right to enforce the restrictive

covenants of a merged corporation normally vests in the surviving entity." *Id.* at 187 (citing *UARCO Inc. v. Lam*, 18 F. Supp. 2d 1116, 1122 (D. Haw. 1998); *Corporate Express Office Prods. v. Phillips*, 847 So. 406, 412 (Fla. 2003); *Alexander & Alexander, Inc. v. Koelz*, 722 S.W. 2d 311, 313 (Mo. Ct. App. 1986); *Aon Consulting Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 637 (Neb. 2008); *Farm Credit Servs. v. Wysocki*, 627 N.W.2d 444, 450-53 (Wis. 2001)).

*Hess v. Gebhard & Co.*, 808 A.2d 912, 914 (Pa. 2002), the other case the Defendants have relied upon, articulates an opposing view. Tracing judicial disfavor of restrictive employment noncompetition covenants to the fifteenth century, the *Hess* Court observed that an early prohibition against noncompetition covenants was generally replaced in the eighteenth century by a balancing test, which examined "an individual's right to work, the public's right to unrestrained competition, and the right to contract." *Id.* at 917. A general prohibition gave way to a view that upheld noncompetition agreements so long as the restraints were partial and reasonable. *Id.* According to *Hess*, the question presented here - whether an employee noncompetition covenant may be assigned to a new owner in the event of a sale – has generated "a wide disparity of treatment among the jurisdictions." *Id.* at 918. *Hess* says that a majority of states has concluded that restrictive covenants are not assignable either because the covenants are personal to the parties or because employment involves personal services, which are not assignable. *Id.* at 918-19. *Hess* says that a few jurisdictions have concluded that an employment contract is assignable in the same manner as any other contract, unless there is a clause prohibiting its assignment. *Id.* at 919.

*Hess* also cites a United States Supreme Court opinion authorized by Justice Oliver Wendall Holmes, which declined to enforce a noncompetition covenant upon the sale of a business:

> The plaintiff could not become substituted to a strictly personal relation.  All that it could do was to enter into a new one which was exactly like that which had existed before.  Service is like marriage, which, in the old law, was a species of it. It may be repeated, but substitution is unknown.

*American Colortype Co. v. Continental Colortype Co.*, 188 U.S. 104, 107 (1903).

*Hess* refused to enforce the noncompetition covenant.  *Hess* held that "a restrictive covenant not to compete, contained in an employment agreement, is not assignable to the purchasing business entity, in the absence of a specific assignability provision, where the covenant is included in a sale of assets."  *Hess*, 808 A.2d at 922.  The Pennsylvania Supreme Court concluded that enforcement was not reasonably necessary to protect the current, non-protectible business interests of the selling business and that an assignment of a restrictive covenant without the consent of the assignee otherwise offends public policy.  *Id*. at 924.

However, in 2010, addressing a stock sale, not a sale of assets, the Third Circuit concluded that "the Pennsylvania Supreme Court would hold that the transfer of some or all of the stock of a corporation has no effect on its ability to enforce a non-compete agreement." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 423 (3d Cir. 2010).  The *Zambelli* and *HD Supply* decisions eclipse each case upon which the Defendants rely to support their contention of nonassignability.   The Third Circuit's *Zambelli* decision is consistent with *HD Supply*: for determining the enforceability of a noncompetition agreement, a sale of assets is different from a merger or stock sale.

As OfficeMax merged with BCOP, the Court concludes that OfficeMax has demonstrated a reasonable likelihood that the noncompetition agreements will be enforceable against Mr. Levesque and Mr. Rattray.[6]

### C.   Irreparable Harm

OfficeMax claims that it will suffer irreparable harm if an injunction is not granted. *Pl.'s Reply* at 5-6. It says that it has lost sales, goodwill, customer contacts, and referral sources. *Id.* at 5. It claims that Mr. Levesque and Mr. Rattray are using confidential OfficeMax information to compete against OfficeMax. *Id.* at 6. In support of its contentions, OfficeMax has proffered two sworn declarations of current employees. *Pl.'s Mot.*, Attach. 3, *Decl. of Deneen Morrotta* (*Morrotta Decl.*); Attach. 4, *Decl. of Rick Theriault* (*Theriault Decl.*). They say that while Mr. Levesque and Mr. Rattray were employed at OfficeMax, they were exposed to highly confidential information that should not be exposed to competitors, including OfficeMax pricing, profit margins, products, strengths and vulnerabilities. *Id.* They say the Defendants also gained unique insights into the corporate and organizational clients that they solicited and served. *Id.* Ms. Morrotta says that she recently visited the Chief Financial Officer (CFO) of Pines Health Center, a client Mr. Rattray had serviced on behalf of OfficeMax and the CFO told her that they were now buying office supplies from County through Mr. Rattray, and not from OfficeMax, because of their pricing. *Morrotta Decl.* ¶ 10.

Mr. Theriault says that during the week of March 1, 2010, he received a call from a representative at Houlton Regional Hospital, a customer Mr. Levesque serviced for OfficeMax.

---

[6] The circumstances surrounding Mr. Levesque's termination at OfficeMax are unclear. OfficeMax says only that he was terminated as a result of a reorganization. *Compl.* ¶ 14 (alleging that "[d]ue to a reorganization, LeVesque's (sic) last day of employment with OfficeMax was November 23, 2009"). Whether OfficeMax's termination of Mr. Levesque affects the enforceability of the noncompetition agreement cannot be determined on these scant facts, and Mr. Levesque has not raised the argument. *See* Kenneth J. Vanko, *"You're Fired! And Don't Forget Your Non-Compete . . ."*: *The Enforceability of Restrictive Covenants in Involuntary Discharge Cases*, 1 DePaul Bus. & Comm. L. J. 1 (2002).

17

*Theriault Decl.* ¶ 5.   The representative told him that the purchasing agent and head of maintenance wanted him to send the copier service business to County, because Mr. Levesque would be able to service the copiers for $20 less per hour.   *Id.*   Houlton Regional rejected the County proposal, but Houlton Regional was purchasing office supplies from County.   *Id.*   Mr. Theriault says that thirteen OfficeMax customers, including McCain Foods, the Presque Isle Chamber of Commerce, Pines Health Services, and the Houlton School, had been approached by Mr. Rattray to service their office supply needs.   *Id.* ¶¶ 6, 8-11.   Although Mr. Levesque and Mr. Rattray filed countervailing declarations, neither responded to the allegations from Ms. Morrotta and Mr. Theriault about soliciting OfficeMax clients.   *Defs.' Resp.* Attach. 1, *Levesque Decl.*; Attach. 5, *Rattray Decl.*

There are several strands of law on the question of irreparable injury.   The Maine Law Court has commented that "protecting an employer from business competition is not a legitimate business interest to be advanced by [a noncompetition agreement]."   *Brignull*, 666 A.2d at 84. At the same time, a covenant not to compete may be reasonable "when the employee during his term of employment has had substantial contact with his employer's customers and is thereby in a position to take for his own benefit the good will his employer paid him to help develop for the employer's business."   *Chapman & Drake*, 545 A.2d at 647 (citations omitted).   In such a situation, an employer may "prevent a former employee from using his trade or business secrets, and other confidential knowledge gained in the course of the employment and from enticing away old customers . . . ."   *Bernier v. Merrill Air Eng'rs*, 2001 ME 17, ¶ 15. 770 A.2d 97, 103 (quoting *Roy v. Bolduc*, 140 Me. 103, 107, 34 A. 479, 480-81 (1943)).

It is a longstanding axiom that "economic harm in and of itself is not sufficient to constitute irreparable injury."   *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*. 839 F.

Supp. 68, 74 (D. Me. 1993) (citations omitted). Speculative injury "does not constitute a showing of irreparable harm." *Id.* Moreover, if "the information the employer seeks to keep confidential could be obtained by legitimate means by its competitors, enforcement of the covenant on that basis is not appropriate." *Hess*, 808 A.2d at 924. For example, in *Carl A. Colteryahn Dairy v. Schneider Dairy*, the Pennsylvania Supreme Court stated that "equity will not protect mere names and addresses easily ascertainable by observation or reference to directories." 203 A.2d 469, 473 (Pa. 1964).

Some of OfficeMax's allegedly confidential information is generally ascertainable. The noncompetition covenant's geographical reach is "within sixty (60) miles of any county in which I performed services for LS&H in the 12 months prior to my termination of employment." *Pl.'s Mot.* Attach. 1, 2 at 1-2. OfficeMax alleges that the Defendants have violated this clause within Aroostook County, Maine, which although geographically large is sparsely populated. *Compl.* ¶¶ 15, 25. The OfficeMax clients mentioned in the Morrotta and Theriault declarations, a hospital, chamber of commerce, school, and large potato processing enterprise, would be the "usual suspects" for any enterprising office supply business, and the Court is not impressed that Mr. Levesque and Mr. Rattray necessarily breached the noncompetition agreement by soliciting obvious clients.

The allegations in the declarations that come closest to stating a claim of irreparable injury are that the Defendants have used their knowledge of OfficeMax pricing to convince OfficeMax clients to purchase office services from County. The Morrotta and Theriault declarations focus with specificity on two clients, Pines Health Service and Houlton Regional Hospital, and an inference can be drawn that Mr. Levesque and Mr. Rattray used their knowledge of OfficeMax pricing to attempt to lure those OfficeMax customers away by offering

lower County pricing for similar OfficeMax services.  "A business's interests in good will, customer contacts, and referral sources cannot be measured in numerical or monetary terms, and neither can the damages to these interests that the plaintiff will suffer without injunctive relief." *Everett J. Prescott v. Ross*, 383 F. Supp. 2d 180, 192 (quotation marks and citation omitted). Yet, here, OfficeMax has identified a universe of thirteen customers and the direct economic damage caused by the Defendants in this relatively small customer group would more readily be compensated by a monetary award for the brief period of time between the resolution of the temporary restraining order and the resolution of the preliminary injunction.

In the circumstances of this motion, the evidence of irreparable injury is too limited for the Court to conclude that if a temporary restraining order is not granted, OfficeMax will suffer irreparable harm.[7]

### D.     Comparative Harm

If the Court had determined that OfficeMax had demonstrated irreparable injury, it would conclude that the balance of the equities favors denial of the motion for temporary restraining order.  As earlier noted, the covenant not to compete covers all Aroostook County plus sixty miles, an extremely large geographic area.  Aroostook County borders Canada on the west, north, and east, and there is no evidence that Mr. Levesque or Mr. Rattray could obtain work permits to sell office goods in Canada.  This leaves only an area south of Aroostook County for the Defendants, and to reach a client not covered by the noncompetition agreement, Mr. Levesque and Mr. Rattray would have to travel for approximately two hours from their homes in Caribou and Fort Fairfield.  As a practical matter, the net effect of the noncompetition covenant

---

[7] Although OfficeMax contends that this case is indistinguishable from *Prescott*, the evidence of irreparable injury in *Prescott* was much more egregious and fully developed.  In *Prescott*, Mr. Ross left a highly sophisticated employer for a less sophisticated competitor and there was direct evidence that he was teaching the competitor the advantages of his former employer's complex business model.  *Prescott*, 383 F. Supp. 2d at 190-91.

would be to deprive both Mr. Levesque and Mr. Rattray of their ability to perform the type of work they have both been doing for OfficeMax and its predecessors for decades. OfficeMax has not proffered areas of work Mr. Levesque and Mr. Rattray could perform, based on their level of training and experience that would not be covered by the noncompetition agreement. *See Lord*, 454 A.2d at 835 (observing that the plaintiff "would be totally precluded from her employment as a licensed insurance agent for over seven years within a sixty mile radius of Machias" and that this amounted to a "severe restriction").

The impact on OfficeMax is apparent. Its former employees, armed with information they garnered as employees, will seek out and attempt to ferret away its long term customers. But, OfficeMax is not helpless. It can and will compete with its former employees for the same business. Though it may lose some customers without the temporary restraining order, it has not asserted that it will lose all of them. Thus, unlike Mr. Levesque and Mr. Rattray, who will effectively lose their livelihoods, OfficeMax may lose only a portion of its business.

Here, in the context of a motion for temporary restraining order, where OfficeMax is demanding immediate injunctive relief, the Court concludes that the balance of equities favors the Defendants.

### E.    Public Interest

To complete the analysis, the Court concludes that the public interest factor is a draw. The Maine Supreme Judicial Court has declared that noncompetition agreements may, in appropriate circumstances, be enforced, a policy decision that it has upheld for over one hundred and forty years. *Bernier*, 2001 ME 17, ¶ 15, 770 A.2d at 103; *Brignull*, 666 A.2d at 84; *Chapman & Drake*, 545 A.2d at 646-47; *Lord*, 454 A.2d at 834; *Roy*, 34 A.2d at 480; *Warren v. Jones*, 51 Me. 146, 149 (1862). The Law Court has said that a covenant not to compete may be

21

reasonable "when the employee during his term of employment has had substantial contact with his employer's customers and is thereby in a position to take for his own benefit the good will his employer paid him to help develop for the employer's business." *Chapman & Drake*, 545 A.2d at 647.

At the same time, Maine recognizes that "the enforcement of an employee's covenant not to compete with his former employer has the potential for greatly restricting that employee's capacity to support himself in his chosen occupation" and "we have emphasized that such covenants 'are contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests at issue.'" *Id.* at 646-47 (quoting *Lord*, 545 A.2d at 834).

Here, the underlying policies both for and against noncompetition agreements are in equipoise.

## III.    CONCLUSION

The Court DENIES OfficeMax Incorporated's Motion for Temporary Restraining Order (Docket # 6) and OfficeMax Incorporated's Motion for *Ex Parte* Consideration of its Motion for Temporary Restraining Order (Docket # 11).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 4th day of May, 2010