UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

OFFICEMAX INCORPORATED,        )
                               )
              Plaintiff,       )
                               )
       v.                      )        CV-10-110-B-W
                               )
COUNTY QWICK PRINT, INC.,      )
d/b/a/ CQP OFFICE SOLUTIONS, et al.  )
                               )
              Defendants.      )

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION
AND MOTIONS TO DISMISS**

Following an extensive testimonial hearing and briefing, the Court concludes

that the individual Defendants, who are former employees of an office supply and

service business, are bound by the terms and conditions of noncompetition

agreements and the Court enjoins the individual Defendants from violating those

agreements. The Court is unpersuaded that the individual Defendants violated the

terms of their confidentiality agreements and it declines to enjoin their use of

confidential information and to find that they violated the Maine Trade Secrets Act.

The Court finds no legal basis to enjoin Defendant corporation. Finally, the Court

denies the Defendants' motion to dismiss.

I.      **STATEMENT OF FACTS**

A.      **Procedural History**

On March 18, 2010, OfficeMax filed a complaint in this Court claiming that

County Qwik Print, Mr. Levesque, and Mr. Rattray had breached Confidential

Information and NonCompetition Agreements (the Agreements) and had violated

Maine's Uniform Trade Secrets Act. *Compl.* (Docket # 1). OfficeMax sought injunctive relief and actual and exemplary damages against the Defendants. *Id.* at 14-15.

On March 19, 2010, OfficeMax moved for a temporary restraining order (TRO). *Pl.'s Mot. for TRO and Prelim. Inj.* (Docket # 6). On April 2, 2010, OfficeMax filed an *ex parte* motion for consideration of its motion for TRO. *Pl.'s Mot. for* Ex Parte *Consideration of its Mot. for TRO* (Docket # 11). At a telephone conference of counsel, the Magistrate Judge ordered the Defendants to respond to the motion for TRO by April 15, 2010. *Report of Hearing and Order Re: Scheduling* at 3 (Docket # 15). On April 13, 2010, the Defendants filed motions to dismiss and on April 15, 2010, they responded to the motion for TRO. *Defs.' Mot. to Dismiss Pl.'s Compl. for TRO, Injunctive Relief, and Damages* (Docket # 16); *Def.'s Mot. to Dismiss Pl.'s Compl. for TRO, Injunctive Relief, and Damages* (Docket # 17); *Defs.' Opp'n to Pl.'s Mot. for TRO and Prelim. Inj.* (Docket # 18). OfficeMax responded on April 16, 2010, to the Defendants' opposition to the motion for TRO. *Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for TRO and Prelim. Inj.* (Docket # 19). On May 4, 2010, the Court denied OfficeMax's motion for TRO. *Order on Mot. for TRO* (Docket # 23).

Still pending, however, were the Defendants' motions to dismiss and OfficeMax's motion for preliminary injunction. On May 14, 2010, OfficeMax replied to the Defendants' motions to dismiss. *Defs.' Reply Mem. in Further Support of Their Mot. to Dismiss Pl.'s Compl. for TRO, Injunctive Relief, and Damages* (Docket # 27). The Court held a two-day hearing on July 2 and 6, 2010, on the motion for

preliminary injunction. *Minute Entries* (Docket # 35, 37). On July 21, 2010, OfficeMax filed a post-hearing brief. *Pl.'s Post-Hearing Br. in Support of its Mot. for Prelim. Inj.* (Docket # 49) (*Pl.'s Br.*). On July 28, 2010, the Defendants filed a post-hearing brief. *Defs.' Post-Hr'g Br. in Opp'n to Pl.'s Mot. for Prelim. Inj.* (Docket # 54) (*Defs.' Br.*). On August 2, 2010, OfficeMax filed a reply brief. *Pl.'s Reply to Defs.' Post-Hr'g Br. in Opp'n to Pl.'s Mot. for Prelim. Inj.* (Docket # 55) (*Pl.'s Reply*).

After attempting to resolve the matter by settlement conference, on August 18, 2010, the parties jointly informed the Court that negotiations had reached an impasse and that further negotiations were unlikely to result in a settlement. *Jt. Report on Status Re: Settlement Negotiations* (Docket # 62). On October 12, 2010, OfficeMax moved for a status conference, requesting that the Court apprise the parties of the status of its motion for preliminary injunction and the status of a scheduling order, and reminding the Court that "Plaintiff has continued to lose a significant amount of business to Defendants." *Pl.'s Req. for Status Conf.* (Docket # 63).[1]

**B.    The TRO Order**

In denying OfficeMax's motion for TRO, the Court determined that "a noncompetition agreement may be assigned with the consent of the employee to a successor business and may be assumed upon merger by another successor business . . . ." *Order on Mot. for TRO* at 1. However, it declined to issue a TRO since OfficeMax failed to fulfill the requirements for immediate injunctive relief. *Id.*

---

[1] As this Order resolves OfficeMax's interest in the status of its motion and as a scheduling order will issue in the ordinary course, the Court DENIES OfficeMax's Plaintiff's Motion for Status Conference. (Docket # 63).

## C.    The Preliminary Injunction Hearing[2]

### 1.    The OfficeMax Case

#### a.    Deposition Excerpts – David Levesque and Dana Rattray

OfficeMax began its evidentiary presentation by reading into the record multiple excerpts of the depositions of Dana Rattray and David Levesque. *Tr. of Proceedings* (Docket # 40, 41) (*Tr.*).

At his deposition, Mr. Rattray admitted that since he left OfficeMax, he had solicited some of his former OfficeMax customers. *See Rattray Dep. Excerpt* at 2.[3] He also confirmed that Mr. Levesque was aware that he was soliciting former OfficeMax customers, and did not tell him not to do so. *Id.* at 3-4. He agreed that he did not intend to stop soliciting former OfficeMax customers unless a court ordered him to stop. *Id.* at 4. Mr. Rattray was asked about an email he sent on February 11, 2010, to Jean Weeks, a former OfficeMax customer, soliciting business from Ms. Weeks' employer Hamlin Associates in Parkman, Maine. *Id.* at 5-6. He confirmed that he sent the email to Ms. Weeks but, despite aggressive questioning

---

[2] Throughout the hearing, OfficeMax periodically designated portions of testimony as protected by a confidentiality order. Although the Court has reviewed and considered all the evidence, in this Order, it has avoided revelation of proprietary information. When a discussion of confidential information is essential, the Court has footnoted the material and sealed the footnotes. The Court is troubled by the breadth of the confidentiality order since the public has a general right to know what is transpiring in its courts. However, for purposes of the motion for preliminary injunction and to avoid delay, the Court has honored the parties' confidentiality designations. In future orders, however, the Court will require that the parties justify the necessity of their designations. Further, although OfficeMax has been concerned with the delay in the issuance of this Order, its wholesale confidentiality designation of substantial portions of the transcript has required the Court to undertake the additional painstaking task of separating public from confidential evidence.

[3] OfficeMax read deposition excerpts into the record and as this part of the hearing was not transcribed, OfficeMax by agreement provided the Court with typewritten versions of the selected testimony. The Court's citations are to the typewritten versions of the deposition testimony that was read into the hearing record.

from OfficeMax counsel, denied that the reference to aggressive pricing in the email was a reference to OfficeMax pricing. *Id.* at 6-8. Based on an email from Mr. Rattray to Mary Ellen Pate on February 1, 2010, Mr. Rattray agreed that he had solicited the Department of Finance and Accounting Services, a former OfficeMax customer, on Friday, January 29, 2010 while he was working at County Qwik Print. *Id.* at 10-11. Mr. Rattray reviewed a list of his top twenty-five OfficeMax accounts and conceded that he has called on most, but not all of them while employed at County Qwik Print. *Id.* at 13-17. Finally, Mr. Rattray acknowledged that if he received a price quote from County Qwik Print's office products supplier, he would not share that quote with OfficeMax. *Id.* at 18-20.

David Levesque admitted that, at some point after he was terminated by OfficeMax, he began selling office supplies to customers on behalf of County Qwik Print. *Levesque Dep. Excerpt* at 1. He thought he began selling sometime in December 2009. *Id.* at 2. He also admitted that, since leaving OfficeMax, he has sold office supplies to former OfficeMax customers. *Id.* at 4-6. He agreed that he did not intend to stop selling office supplies to former OfficeMax customers unless a court ordered him to do so. *Id.* at 7. Mr. Levesque testified that, as far a confidential OfficeMax information was concerned, he told Mr. Rattray that "OfficeMax stuff stays at OfficeMax." *Id.* at 9. Mr. Levesque was questioned about how he arrives at a price to quote to County Qwik Print customers and he said that, after receiving his wholesaler's price, he sets his price by "the seat of our pants." *Id.* at 12. He even said that County Qwik Print did not track its profit but that it had

recently purchased software to allow it to do so. *Id.* at 15-17. He was questioned extensively about a three-page list of products with assigned dealer cost and handwritten numbers. *Id.* at 18-27.

### b.    Jason Sullivan

Jason Sullivan is the Senior Security Engineer for OfficeMax. *Tr.* 34:8-17. Mr. Sullivan described the various computer systems at OfficeMax and how employees access the OfficeMax system, and confirmed that there are various levels of access accorded different employees.[4] *Id.* 37:2-7; 38:3-6. He emphasized that OfficeMax goes to great lengths to keep customer information confidential. *Id.* 38:14-19.

On cross-examination, Mr. Sullivan conceded that the customer names in OfficeMax's secured system would likely be available in a local phonebook. *Id.* 40:12-24. He also admitted that he could not be certain that, even though Messrs. Levesque and Rattray had access to OfficeMax's internal programs, either of them had ever actually used them. *Id.* 41:11-20.

### c.    Rick Theriault

Rick Theriault is the supervisor technician/service manager of the Caribou, Maine office for OfficeMax. *Id.* 45:9-12. Mr. Theriault confirmed that, in the fall of 2009, OfficeMax had undergone a sales-force reorganization, and as a consequence, Mr. Levesque "is no longer working for OfficeMax." *Id.* 45:13-22. Mr. Theriault said that Mr. Levesque had mentioned several times that he "never did sign" a noncompetition agreement. *Id.* 46:1-2. In late fall 2009, Mr. Levesque mentioned to

---

[4] Sealed footnote.

Mr. Theriault that if he was terminated, Mr. Levesque "might have to end up having to, you know, sell office products because that's all he's ever known and ever done." *Id.* 46:3-9. Mr. Theriault confirmed that Mr. Levesque left OfficeMax in November 2009. *Id.* 46:17-19. After Mr. Levesque left, Mr. Theriault began to visit OfficeMax customers "trying to keep them with our business." *Id.* 47:6-13. After Dana Rattray left OfficeMax, the Caribou office of OfficeMax began seeking a sales representative replacement and as of July 2010, had only recently hired a sales representative to replace Mr. Rattray. *Id.* 47:19-23; 48:1-15.

Mr. Theriault testified that, while he was visiting an OfficeMax customer in December 2009, the customer informed Mr. Theriault that Mr. Levesque had told the customer that he was going to be selling office products.[5] *Id.* 54:1-13. He also said that, although Mr. Rattray acknowledged to Mr. Theriault that he had signed a noncompetition agreement, Mr. Rattray had contended that the agreement would not "hold water." *Id.* 55:17-19. Mr. Theriault also testified that he had received a call from an OfficeMax customer, R.L. Todd, and Mr. Todd had informed Mr. Theriault that they had purchased furniture from Mr. Levesque under the impression he was still working for OfficeMax and was surprised to get an invoice from County Qwik Print. *Id.* 55:22-56:16. Mr. Theriault stated that since Messrs.

---

[5] OfficeMax contended that under *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 25-26 (1st Cir. 1986), the First Circuit had ruled that "[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding." The Defendants objected to the admission of hearsay at the preliminary injunction proceeding. However, as *Asseo* clarified, hearsay may be admissible at a preliminary injunction proceeding. *See Contour Design, Inc. v. Chance Mold Steel Co., Ltd.*, Civil No. 09-cv-451-JL, 2010 U.S. Dist. LEXIS 10026, *3 (D. N.H. Jan. 14, 2010); *Arista Records LLC v. Does 1-27*, 584 F. Supp. 2d 240, 255 (D. Me. 2008). The Court overrules the Defendants' hearsay objections.

Levesque and Rattray left OfficeMax, its sales have "dropped significantly."[6]  *Id.* 58:1-6.  Finally, Mr. Theriault said that OfficeMax had moved its physical location in Caribou and County Qwik Print now occupies some of the space once occupied by OfficeMax.  *Id.* 61:12-62:9.

On cross-examination, Mr. Theriault acknowledged that, in the fall of 2009, OfficeMax undertook a "redeployment of sales personnel" and required all members of its sales force to reapply and re-interview for their sales positions.  *Id.* 63:6-15. Mr. Levesque lost his job with OfficeMax through that procedure.  *Id.* 63:20-22. After Mr. Levesque lost his job, Mr. Rattray was required to service not only his own customers but Mr. Levesque's former customers as well.  *Id.* 63:23-64:2.  Mr. Theriault also admitted that, since Mr. Rattray left OfficeMax, the OfficeMax Caribou office had not employed a full-time sales representative until just recently when it hired Andy.  *Id.* 66:11-16.  Mr. Theriault also confirmed that he was contacted by the Houlton School Department to price certain items and he informed her that OfficeMax "couldn't price it in competitive nature with school specialty." *Tr.* 67:11-22.

### d.   Thomas Richard Polcaro

Richard Polcaro is the East Region Vice President of Sales for OfficeMax.  *Id.* 69:13-20.  His geographic area of responsibility extends from Maine to Florida and includes Puerto Rico.  *Id.* 69:17-22.  Mr. Polcaro explained that OfficeMax has two divisions, retail and "business to business."  *Id.* 69:23-70:8.  OfficeMax uses sales representatives only for the business-to-business aspect of its operation.  *Id.* 70:2-

---

[6] Sealed Footnote.

10.   For approximately four years, beginning in 2000, Mr. Polcaro had direct supervisory responsibility for OfficeMax's Caribou office, including Mr. Levesque and Mr. Rattray.  *Id.* 71:4:19.

Addressing events in 2009 and 2010, Mr. Polcaro agreed that Mr. Levesque was terminated from OfficeMax and he said that Mr. Levesque refused to accept severance pay upon termination.[7]  *Id.* 74:12-18.  Mr. Polcaro testified that, in addition to selling a wide variety of office products, the Caribou office was unique in offering technical service for problems with copiers, printers, and fax machines.  *Id.* 75:3-19.  In part because of the "holistic approach" OfficeMax developed with its customers, it was able to retain its customers despite competition.[8]  *Id.* 76:4-20.

Mr. Polcaro described the OfficeMax catalogue, which lists all OfficeMax products and all OfficeMax prices.[9]  *Id.* 82:8-18.  Mr. Polcaro testified that both Mr. Levesque and Mr. Rattray possessed unusually accurate memories about the current pricing of OfficeMax products.[10]  *Id.* 94:9-24.  Mr. Polcaro also referred to an email dated within a month after Mr. Rattray left OfficeMax that Mr. Rattray sent to an OfficeMax customer named Jean Weeks assuring her that County Qwik Print's "pricing structure's very aggressive" and that she would be "pleasantly surprised."  *Id.* 94:25-95:14.  In the email, Mr. Rattray told Ms. Weeks that County Qwik Print could use OfficeMax part numbers and switch them over.[11]  *Id.* 96:4-6.

---

[7] Sealed footnote.
[8] Sealed footnote.
[9] Sealed footnote.
[10] Sealed footnote.
[11] Sealed footnote.

Mr. Polcaro emphasized that both Mr. Levesque and Mr. Rattray were excellent sales representatives. *Id.* 101:11-24. In fact, when Mr. Rattray resigned, Mr. Polcaro contacted him and told him he would "do anything [he] could to keep him employed at the organization." *Id.* 101:25-102:7. He explained that OfficeMax had a difficult time recruiting a new sales representative. *Id.* 102:13-25. Further, he said that even if an injunction issued, it would still be difficult for the new sales representative at the Caribou office of OfficeMax to win back the customers who switched allegiance to Mr. Levesque and Mr. Rattray after they left OfficeMax. *Id.* 106:25-107:25.

On cross-examination, Mr. Polcaro conceded that, as a part of its sales reorganization, OfficeMax shifted smaller customers from personal contact with local sales representatives to telephone contact with its telephone sales division. *Id.* at 120:1-16. Mr. Polcaro admitted that when a customer was moved from a personal sales representative to telesales, there was a risk that it would lose the customer. *Id.* 121:2-9.

Questioned about the OfficeMax price catalogue, Mr. Polaro conceded that OfficeMax shared some of the information in the price catalogue with its customers, but he emphasized that the customers were asked to keep it confidential. *Id.* 129:2-19. He agreed that OfficeMax has no control over what the customer did with the information. *Id.* 129:20-24. Mr. Polaro denied that customer purchase decisions are driven by price, but agreed that price is "one component" of the decision. *Id.* 132:22-133:8.

e.    **Dana Rattray**

Dana Rattray is a native of Aroostook County and attended local schools, including the University of Maine at Presque Isle.  *Id.* 215:17-22.  In 1987, he was hired by Fitzgerald Office Supply and worked in all aspects of the business.  *Id.* 216:2-3, 10-22.    He worked for Fitzgerald for seven years before they sold the business to Loring, Short & Harmon (LS&H).  *Id.* 216:7-9.  Fitzgerald had both a retail and business-to-business division.  *Id.* 217:2-5.  During Mr. Rattray's tenure at Fitzgerald and at LS&H, Mr. Rattray was employed in a number of roles; however, at the time Boise Cascade Office Products Corporation (BCOP) bought LS&H in February 1996, Mr. Rattray was working as the in-store manager.  *Id.* 222:3-6.  After the sale to BCOP, Mr. Rattray then began working in outside sales. *Id.* 223:23-25, 226:18-22.

Before the LS&H sale to BCOP, Mr. Fitzgerald asked Mr. Rattray to sign a confidential information and noncompetition agreement in favor of BCOP.  *Id.* 224:7-8.  Mr. Rattray thought he was still a LS&H employee when he signed the Agreement.  *Id.* 225:4-7.  He was paid $2,500 to sign it.  *Id.* 224:25-225:3.  After the LS&H sale, Mr. Rattray was required to formally apply for employment at BCOP. *Id.* 225:8-12.  He filled out an application and was hired. *Id.* 225:15-25.

Similarly, when BCOP later merged with OfficeMax, Mr. Rattray was again required to undergo an application process for employment.  *Id.* 227:20-228:4.  In March 2006, Mr. Rattray received a letter from OfficeMax welcoming him as an employee and enclosing a noncompetition agreement, which he never executed.  *Id.*

232:4-20. Mr. Rattray said that the pay package at OfficeMax was different from the BCOP pay package. 228:9-25; 229:1-20.

In the fall of 2009, Mr. Rattray learned through a national sales call that OfficeMax was going to reevaluate its sales force. *Id.* 234:18-24. The sales force was required to go on-line and reapply for their positions.[12] *Id.* 234:25-235:8. On November 16, 2009, Mr. Rattray learned that he had been retained, just before Mr. Levesque learned that he had not. *Id.* 236:11-25. Mr. Rattray's title and pay changed.[13] *Id.* 237:1-14. Mr. Rattray signed the employment offer the next day, November 17, 2009, but was not asked to sign a new confidential information and noncompetition agreement at that time. *Id.* 239:23-240:5. In fact, the retention letter contained a notation—"No NC Needed"—which Mr. Rattray assumed meant "No noncompetition agreement needed." *Id.* 240:6-15. Once Mr. Levesque left, Mr. Rattray was expected to service Mr. Levesque's line of business. *Id.* 240:16-22. Mr. Rattray said that a couple of Mr. Levesque's accounts escorted him to the door because of the way OfficeMax had treated Mr. Levesque. *Id.* 241:1-11. Between November 2009 and January 2010, when he quit, Mr. Rattray lost about ten of Mr. Levesque's top accounts, but was able to retain six or seven.[14] *Id.* 241:12-242:10. OfficeMax told Mr. Rattray to direct some of Mr. Levesque's customers to other parts of OfficeMax.[15] *Id.* 242:23-243:2. Mr. Rattray's experience with redirected customers is that they did not tend to stay with OfficeMax. *Id.* 243:23-244:5.

---

[12] Sealed footnote.
[13] Sealed footnote.
[14] Sealed footnote.
[15] Sealed footnote.

Mr. Rattray said that in the fall of 2009, OfficeMax's competition in Aroostook County included Staples, W.B. Mason, Netherland Typewriter, Levesque Office Supply, and CNS Engineers. *Id.* 244:6-13. He testified that his customers routinely would ask him to match or beat a competitor's price, and at times he was able to do so but at other times, he was not.[16] *Id.* 245:4-17.

After OfficeMax terminated Mr. Levesque, the OfficeMax Caribou office was staffed by Deborah Sirois, Rick Theriault, Bob Clark, two technicians, and Mr. Rattray. *Id.* 246:25-247:4. Ms. Sirois was sales administrator but she handled a number of tasks within the office; Mr. Theriault was service manager; and, Bob Clark was delivery driver.[17] *Id.* 247:5-248:4.

Mr. Rattray denied that, after he left OfficeMax, he was able to use his knowledge of the OfficeMax pricing system to determine what OfficeMax was currently charging for specific products. *Id.* 253:1-10. He said that he could not remember all the prices and, in any event, they changed frequently. *Id.* 252:10-25.

Mr. Rattray said that his decision to leave OfficeMax was "a tough decision." *Id.* 254:8-12. He explained that he had worked there for twenty-four years and the people in the office were his friends. *Id.* 254:12-14. When OfficeMax offered to retain him, even though it expected him to pick up Mr. Levesque's work, it did not offer an increase in his compensation and he had received no increase for nine years. *Id.* 255:1-5. When he complained, he was told: "[T]here comes a time in life . . . when you either suck it up or you decide you need to move on." *Id.* 255:14-16.

---

[16] Sealed footnote.
[17] Sealed footnote.

Mr. Rattray decided to accept the offer and he continued to work for OfficeMax from November 2009 to late January 2010. *Id.* 255:21-25. When he left employment at OfficeMax, Mr. Rattray said he did not have another job offer and specifically denied having an offer of employment from County Qwik Print. *Id.* 256:1-10. He explained that he had worked for twenty five years, 60 to 70 hours a week, and was burned out; also, he said that he has a special needs daughter and wanted to spend time with her. *Id.* 256:11-17.

When he left OfficeMax, he returned all equipment, including the employer-issued Blackberry and laptop. *Id.* 257:1-23. He did not retain any books, manuals, price or customer lists. *Id.* 257:24-258:1. Regarding the OfficeMax tools for sales, Mr. Rattray said they were not useful and described them as "fluff." *Id.* 258:7-12.

Mr. Rattray thought that he hired on with County Qwik Print about one week and a half to two weeks after he left OfficeMax, but agreed that there were emails showing earlier activity for County Qwik Print. *Id.* 258:18-259:4. Mr. Rattray said he contacted David Levesque and asked Mr. Levesque whether he had any work for him at County Qwik Print. *Id.* 259:5-12. Mr. Levesque said that he would find something for him to do. *Id.* 259:13-14. Mr. Rattray said that he looked in the newspaper for other work but the only available employment either low-paying retail jobs or work, such as social work, that he was not qualified to perform. *Id.* 259:19-260:2. When he first spoke to Mr. Levesque, Mr. Rattray was generally aware that Mr. Levesque had been thinking of expanding his printing business into office supplies but he was not aware that he had begun to do so. *Id.* 260:6-11. In

fact, the first day on the job for County Qwick Print, Mr. Rattray reviewed the printing process to see if he could streamline it; however, as time went on, he began to get calls from former customers and he began doing the same office supply sales work that he had done for OfficeMax. *Id.* 260:12-261:15.

Currently, Mr. Rattray has a group of customers for whom he does business. *Id.* 261:22-25. Geographically, he services an area similar to the one he serviced for OfficeMax: from Fort Kent in northern Maine to Island Falls in Penobscot County. *Id.* 262:14-20. It would be illegal for him to work in Canada and he does not do so. *Id.* 262:10-13. Mr. Rattray admitted he is currently servicing customers that he serviced while at OfficeMax and that his former OfficeMax customers form 70 to 75% of his customer base. *Id.* 262:25-263:11. Some former OfficeMax customers have not used his services at County Qwik Print. *Tr.* 263:12-14. As before, the customers' primary concern remains price and for some items, County Qwik Print has been competitive and for others it has not. *Tr.* 263:19-264:2. He denied that he was able to use information he had gained while at OfficeMax to compete for business. *Tr.* 264:3-6. He explained that County Qwik Print uses a different vendor and that, as opposed to OfficeMax, County Qwik Print is "two guys and a truck." *Id.* 264:7-12. To find the price, Mr. Rattray obtains the cost of an item from County Qwik Print's supplier and determines County Qwik Print's cost; he then makes a bid for the business. *Id.* 264:15-20. But he said that there was nothing in his experience at OfficeMax that was useful in coming up with a final price at County Qwik Print. *Id.* 264:21-24. Mr. Rattray testified that when he joined County

Qwik Print, Mr. Levesque told him that, if he had any OfficeMax material, he should "get rid of it." *Id.* 268:14-18.

On cross-examination, Mr. Rattray was confronted with earlier deposition testimony in which he stated that, from the time he left OfficeMax until the time he went to work at County Qwik Print, he had not looked for work. *Id.* 269:14-270:11. Mr. Rattray responded that he assumed the deposition question was directed toward going "on foot and beat the street" to seek employment. *Id.* 270:6-14. Furthermore, when confronted with certain emails, Mr. Rattray admitted that he had actually begun to work in office equipment sales for County Qwik Print as early as January 29, 2010—within four days of leaving OfficeMax. *Id.* 273:7-275:8. Mr. Rattray maintained his denial that he had sought business from former OfficeMax customers when he was first employed at County Qwik Print and that, instead, customers began to call him. *Id.* 275:22-276:9. Mr. Rattray was confronted with an email that he wrote on February 11, 2010 to Jean Weeks, a Hamlin Associates employee, seeking Hamlin's business and he admitted that he had solicited Ms. Weeks; she had not contacted him first. *Id.* 305:19-306:10. He admitted there were other customers he had contacted first but "very few." *Id.* 306:11-14.

Regarding the former OfficeMax customers that had been lost by OfficeMax because they had been shifted to telesales, Mr. Rattray acknowledged that if a court order did not prevent County Qwik Print from pursuing those accounts, they would be a source of business for County Qwik Print. *Id.* 288:12-289:4. However, he also said that for an office supply business to be successful, there has to be a mixture of

large and small customers. *Id.* 288:12-21. He also agreed that part of his current work for County Qwik Print involves selling printing services, and that if the court were to fashion an order to exclude any prohibition from selling printing services, he would be able to continue that line of work. *Id.* 295:5-19. Mr. Rattray added, however, that customers looking for printing services mix their printing requests with requests for office products. *Id.* 295:12-19. Mr. Rattray admitted that, in terms of the division of customers between Mr. Levesque and himself, they basically have continued to split those customers along the same lines as the division at OfficeMax. *Id.* 313:21-314:1.

### f. David Levesque

David Levesque is a Caribou, Maine, resident, who graduated from Caribou High School. *Id.* 322:1-9. He began working when he was fourteen and continued to do so through high school. *Id.* 322:10-15. In the 1980s he became connected with a farmer and helped him manage his farming business, dealing with cattle, lumber, and crops, and eventually, this business developed a sales office. *Id.* 322:16-21. Mr. Levesque was involved in a motor vehicle accident, which when combined with exposure to chemicals and dust, caused him to seek other employment and at age 23, Mr. Levesque began work for Fitzgerald Office Supply. *Id.* 322:22-323:5. When he joined Fitzgerald, it was a husband-and-wife operation with only one service technician. *Id.* 323:15-18. They hired Mr. Levesque to help them build the business, including hiring new people, finding new product lines, growing equipment lines, and hiring more servicemen. *Id.* 323:19-324:3. Mr. Levesque

brought along his business contacts from the farming business and while at Fitzgerald, he developed that list. *Id.* 324:7-325:3.

Mr. Levesque explained that while he was working for Fitzgerald, he developed a side business called County Qwik Print, which Mr. Levesque began by offering printing services for Fitzgerald's office product customers. *Id.* 326:4-23. The Fitzgeralds did not have any involvement with County Qwik Print in the beginning but later they became part owners. *Id.* 326:24-327:10. The two businesses encouraged their customers to use the other's services and the number of common customers was extensive. *Id.* 327:17-328:5. Usually, a customer bought office supplies from Fitzgerald and printing from County Qwik Print, but occasionally, a customer that did not wish to purchase office supplies from Fitzgerald would buy office supplies from County Qwik Print. *Id.* 328:18-329:1. Mr. Levesque spent 40 to 50 hours per week working at each business. *Id.* 329:2-10. Mr. Levesque explained that County Qwik Print was involved in off-set printing, screen printing, embroidery, graphic design, scanning, and other similar services. *Id.* 329:22-330:4. After he first purchased the business, he ran all the equipment and did the marketing. *Id.* 329:11-17.

After LS&H bought Fitzgerald, Mr. Levesque's duties remained the same. *Id.* 337:17-338:3. However, Mike Fitzgerald left LS&H and went to work full-time for County Qwik Print; Dottie Fitzgerald remained with LS&H and acted as Mr. Levesque's direct boss. *Id.* 338:4-7; 338:23-25. After a time, Mr. Levesque learned that BCOP was going to purchase LS&H and Dottie Fitzgerald asked him to sign a

noncompetition agreement. *Id.* 339:15-340:13. Mr. Levesque was reluctant to sign it so he dragged his feet, but Dottie Fitzgerald pressured him to sign the Agreement and he eventually did. *Id.* 340:16-341:24.

When BCOP took over LS&H, Mr. Levesque applied for a salesman position and on February 10, 2006, BCOP offered him employment. *Id.* 342:3-22. After he began employment with BCOP, it sent him a packet of documents for him to sign and return, including a noncompetition agreement, but he never signed them. *Id.* 344:12-345:1. BCOP approached him a couple of times about the unsigned documents and after Mr. Levesque stonewalled, BCOP ultimately failed to follow up. *Id.* 345:2-22.

After BCOP merged with OfficeMax, Mr. Levesque along with other BCOP employees was required to apply as a new employee. *Id.* 346:1-7. On April 3, 2006, Mr. Levesque signed a letter accepting employment with OfficeMax. Defs.' Ex. # 13; *Tr.* 347:1-15. Mr. Levesque did not recall receiving a written request from OfficeMax to sign a noncompetition agreement and never signed one. *Tr.* 347:16-25; 348:1. He testified that Mr. Polcaro told him he had to sign a noncompetition agreement but that he "just avoided it." *Id.* 348:8-22.

In the fall of 2009, at a national sales meeting, Mr. Levesque learned that OfficeMax was undertaking a reorganization and the entire OfficeMax sales team was going to be eliminated and replaced with two new sales positions: one for gross sales of $10 million per year and another for $5 million per year. *Id.* 348:23-349:12. The sales force was invited to apply for the position. *Id.* Mr. Levesque reapplied for

the position and was interviewed. *Id.* 350:1-9. He was later called to the Caribou office of OfficeMax and was informed that his employment with OfficeMax had been terminated. *Id.* 351:3-14. He asked what he was supposed to do about sales he had not yet written up and was told that OfficeMax would take care of them. *Id.* 351:15-19. Mr. Levesque returned his laptop and Blackberry to OfficeMax. *Id.* 352:2-6. He did not take any electronic information off of the laptop or Blackberry and did not retain any customer lists. *Id.* 352:7-14. He was handed a package from OfficeMax that was entitled Waiver of Claims and General Release, which set forth his termination benefits and contained a noncompetition clause. Defs.' Ex. 14; *Tr.* 354:24-355:10. Mr. Levesque did not accept the severance package due to the noncompetition clause. *Tr.* 355:11-13.

After his termination, Mr. Levesque first turned to his printing business and attempted to expand its customer base. *Id.* 359:13-360:2. Although he was aware of the noncompetition provision in the LS&H Agreement, he did not think it was still effective. *Id.* 360:13-22. Around Christmas Mr. Levesque decided to expand County Qwik Print and sell office products. *Id.* 361:17-362:3. To do so, he had to contact a wholesaler to provide products to him; once he had a supplier, he began to contact his former customers to sell office products and they began to contact him. *Id.* 362:4-363:21. Some of his former OfficeMax customers told him that he would have all their business. *Id.* 366:17-367:3.

In his spare time, Mr. Levesque compiled a list of products and prices that he could leave with his customers. *Id.* 367:17-368:11; Pl.'s Ex. Z-8. He first developed

a product list while working for Fitzgerald. *Tr.* 368:12-15. Mr. Levesque said that there was nothing about his experience with OfficeMax that he could use to compete with OfficeMax. *Id.* 371:23-372:5. He remarked that his operation is "a print shop trying to sell furniture" and it cannot compete with a national organization. *Id.* 372:6-22. Furthermore, the prices for office products change "every day." *Id.* 372:23-373:3.

Mr. Levesque said that if the Court enjoined County Qwik Print from selling office products, it would shut the entire operation down because of the financial impact. *Id.* 374:3-14. He said that if the order restricted County Qwik Print from selling to his OfficeMax customers, County Qwik Print would not be able to survive on new business in Aroostook County and that he must remain in Aroostook County because of the need to care for his elderly parents. *Id.* 374:20-375:3. He said he has no transferable skills. *Id.* 375:4-11.

On cross-examination, Mr. Levesque acknowledged that County Qwik Print has been in business for about 20 years and that, in November 2009, it had ten employees, including seven full-time and three part-time.[18] *Id.* 376:6-8; 377:23-378:7. Mr. Levesque agreed that he was the person who decided to hire Dana Rattray, noting that Mr. Rattray had contacted him about employment and had asked whether there was any work at County Qwik Print. *Id.* 378:11-20. When County Qwik Print hired Mr. Rattray, however, he was not expected to sell office products. *Id.* 379:7-10. Mr. Levesque agreed that County Qwik Print hired Mr. Rattray effective Thursday, January 28, 2010. *Id.* 381:17-382:6.

---

[18] Sealed footnote.

Mr. Levesque was quizzed about Plaintiff's Exhibit Z-8, which is a product and pricing list. Pl.'s Ex. Z-8; *Tr.* 393:1-397:20. He insisted that he came up with the prices based on a variety of facts and that the prices were "a combination of things." *Tr.* 397:16-20. Also, Mr. Levesque admitted that he began to sell office products to his former OfficeMax customers as early as December 29, 2009 and perhaps earlier. *Id.* 403:9-404:6. He also acknowledged that in March 2010, he was asked by Houlton Regional Hospital to bid on a job that he had worked on while he was employed at OfficeMax. *Id.* 404:22-406:12. Mr. Levesque agreed that he would not share his gross-profit margin with his competitors. *Id.* 410:16-20.

On redirect examination, Mr. Levesque clarified that in the fall of 2009, Houlton Regional Hospital had purchased the office equipment he had discussed with them while he was employed at OfficeMax and that when Houlton Regional Hospital contacted him in March 2010, it was for another order. *Id.* 414:8-21.

### D. The Parties' Positions

#### 1. OfficeMax's Complaint

Demanding that the Court enjoin the Defendants from competing against it, OfficeMax contends that the Defendants have engaged in a "blatant course of wrongful conduct," which has "devastated OfficeMax's Caribou operation." *Pl.'s Br.* at 3. OfficeMax claims loss of "[s]ignificant sales and revenue," and loss of "customer good will." *Id.* at 3-4. Because the Defendants failed to comply with the terms of the noncompetition provision, OfficeMax says that it lost time "to try and stabilize the situation" while the Defendants "used the element of time to their own, unfair advantage, to inflict great harm upon OfficeMax by competing for the same

customers that they had serviced for OfficeMax only weeks and months before." *Id.* at 4.

Addressing the four requirements for injunctive relief, OfficeMax says that there is a strong likelihood that it will prevail on the merits because the Court previously ruled in its favor on the effectiveness of the Agreements that Mr. Levesque and Mr. Rattray each signed while they were employed at LS&H. *Id.* at 5. OfficeMax acknowledges that the remaining question is whether the terms of the noncompetition provision within the Agreements are reasonable as OfficeMax seeks to enforce them. *Id.* at 6. OfficeMax delineates its request:

> For purposes of its Motion for Preliminary Injunction, OfficeMax seeks an Order from this Court to prohibit Defendants Levesque and Rattray from directly or indirectly, soliciting or selling office supplies, office furniture, office technology products, and copier and printer repair services to those customers whom they solicited and sold such products and services to on behalf of OfficeMax, in the year prior to the end of their respective periods of employment, where such customers are located within Aroostook County or within sixty (60) miles outside the border of the County.

*Id.* at 6-7. OfficeMax claims their demand comports with prior state and federal court decisions, which it says have upheld greater restrictions and is coterminous with the geographic location of the customers and prospective customers that the Defendants solicited and served while employed by OfficeMax. *Id.* at 7.

OfficeMax views with utter skepticism the Defendants' assertions that they "cannot remember" OfficeMax confidential information. *Id.* at 8. Further, OfficeMax observes that the Defendants are not protected by their claim that they did not take any documents or files with them when they left OfficeMax, since the Maine's Uniform Trade Secrets Act prohibits "use" of a trade secret if "acquired

23

under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Id.* at 9 (quoting 10 M.R.S. § 1542(2)(b)(ii)).

OfficeMax says that its continuing loss of "good will, customer contacts, and referral sources 'cannot be measured in numerical or monetary terms, and neither can the damages to these interests that plaintiff will suffer without injunctive relief.'" *Id.* (quoting *Everett J. Prescott v. Ross*, 383 F. Supp. 2d 180, 192 (D. Me. 2005)). Among other examples, OfficeMax points to Mr. Levesque's core pricing list, which he assembled after he left OfficeMax and began competing for its business. *Id.* at 12.

OfficeMax contends that the balance of equities strongly favor the issuance of the injunction. It says the very existence of its Caribou operation depends upon the injunction due to Defendants' "wrongful conduct." *Id.* at 14. OfficeMax emphasizes that it does not seek "to enjoin County Qwik Print from continuing to operate its printing services or enjoin Defendants from continuing to work for County Qwik Print in that capacity." *Id.* at 15.

Finally, OfficeMax argues that the public interest weighs in favor of granting the injunction because the public has an interest in having "lawful contracts upheld." *Id.* at 16. It notes that even though customers in Aroostook County will be somewhat affected by the injunction, there remains a competitive market for office products in Aroostook County and "they will continue to have choices and the benefit of competition in making such decisions even though they cannot purchase

such products and services from Defendants during the pendency of an injunction." *Id.*

### 2. The Defendants' Response

The Defendants urge the Court to deny the motion for preliminary injunction because they say OfficeMax cannot meet any of the four criteria for the issuance on injunctive relief and emphasize OfficeMax's failure to prove the first essential criterion: likelihood of success on the merits. *Defs.' Br.* at 1-2. The Defendants posit three questions, which they say the Court must answer in order to resolve whether OfficeMax is likely to be successful on the merits: 1) whether the LS&H Agreements were assignable; 2) whether they were actually assigned; and 3) whether OfficeMax is entitled to enforce the Agreements as a result of its merger with BCOP. *Id.* at 2. The Defendants concede that the Court's TRO Order resolved the first question against them but vigorously dispute whether the Court reached the last two questions and urge the Court to resolve these questions in their favor. *Id.* at 2-3.

Turning to the second question, the Defendants note that, in its TRO Order, the Court assumed that LS&H had assigned the Agreements to BCOP. *Id.* at 3 (citing *Order on Mot. for TRO* at 9 n.4, which states that "[i]n their motion to dismiss, the Defendants assume that LS&H assigned the noncompetition agreements to BCOP"). The Defendants contend that, upon analysis, the Stock Purchase Agreement (SPA) did not assign the Agreements and that OfficeMax is relying on inapplicable and ineffective clauses to make its case. *Id.* at 3-4. Specifically, the Defendants dismiss OfficeMax's reliance on Articles 2.1, 2.6 and 8.9

of the SPA to effect the assignments as inconsistent and meritless. *Id.* at 4. Further, the Defendants point out that neither Mr. Levesque nor Mr. Rattray ever actually signed a noncompetition agreement with BCOP as was contemplated by LS&H and BCOP at the time of the sale. *Id.* at 4-5.

Moreover, observing that LS&H was dissolved after the sale, the Defendants cite *Sturtevant v. Town of Winthrop*, 1999 ME 84, 732 A.2d 64, for the proposition that, when LS&H dissolved, so did BCOP's rights under the assignment, and that after two years, under Maine's then existing corporate dissolution and survival statute, BCOP's assigned legal rights dissolved with LS&H's dissolution. *Defs.' Br.* at 5-6. The Defendants emphasize that BCOP was a different entity after the stock sale and that the individual Defendants were required to apply for employment with BCOP. *Id.* at 7-8. They point to evidence that BCOP repeatedly asked Messrs. Levesque and Rattray to execute noncompetition agreements expressly in favor of BCOP, but that neither did so, and they ask rhetorically whether BCOP would have sought new noncompetition agreements if the old ones were effective. *Id.* at 8-9.

Regarding the third question—the post-merger enforceability of the Agreements—the Defendants acknowledge that the Court previously determined that OfficeMax is entitled to enforce the Agreements because BCOP merged with OfficeMax, but they say that they were hired by OfficeMax before the effective date of the merger and therefore, the general principle that the Court relied on in its TRO Order does not apply. *Id.* at 9.

Finally, the Defendants claim that the terms of the noncompetition provision should not be enforced because they are unreasonably restrictive and, additionally, as regards Mr. Levesque, are unenforceable because he was fired by OfficeMax. *Id.* at 9-12.

Regarding the Maine Trade Secrets Act claim, the Defendants contend that the OfficeMax case fails for want of proof. *Id.* at 12 (stating that OfficeMax has failed to "cite a single instance of misappropriation or use"). Also, they say that the OfficeMax catalogue of products is "too extensive" and pricing "too volatile" to be of any use to the Defendants and that to be of any value, the Defendants would have to also know OfficeMax's product costs. *Id.* at 12-13.

Turning to the second criterion—irreparable injury—the Defendants say that OfficeMax failed to establish that they have used confidential OfficeMax information to compete against it or how OfficeMax could have been damaged from the alleged use. *Id.* at 14-15. The Defendants claim that any loss of business by OfficeMax was caused by its own reorganization and cost-cutting actions, including its termination of Mr. Rattray and its transfer of customers to telesales. *Id.* at 16. The Defendants are skeptical about OfficeMax's threat to close the Caribou office in Aroostook County, claiming that the spectre of closing has "long loomed over the branch" and therefore, Defendants contest whether the vulnerable status of the branch is attributable to their competition. *Id.* at 16-17.

Regarding the third factor—the equities—the Defendants contend that the unique geography of Aroostook County makes the requested injunction "virtually

draconian." *Id.* at 18. Continued employment solely in the County Qwik Print printing operation would be, according to the Defendants, insufficient to sustain County Qwik Print as a viable operation and County Qwik Print would have to "close its doors," leading to the layoffs of approximately 10 people. *Id.* By contrast, claiming that any threatened closure of the OfficeMax Caribou operation would be "speculation," *id.* at 19 n.10, County Qwik Print assures the Court that OfficeMax has the resources and ability to compete with County Qwik Print in Aroostook County. *Id.* at 19.

Finally, addressing the last element—public interest—County Qwik Print maintains that the Court's analysis of this factor in its TRO Order "remains a draw." *Id.* at 20.

### 3. OfficeMax's Reply

Answering the first of the Defendants' three legal questions, OfficeMax first contends that the Defendants have conceded that the Agreements were assignable. *Pl.'s Reply* at 1-2. Turning to their second question—whether the Agreements were in fact assigned—OfficeMax gives some ground, tacitly acknowledging that the SPA may not explicitly recite the assignment, but OfficeMax argues that its terms should nonetheless be construed as demonstrating that "all of the outstanding promises and obligations of LS&H and BCOP were . . . fulfilled prior to or at the closing of the sale." *Pl.'s Reply* at 2-3. OfficeMax says that LS&H was required, as a condition of the sale to BCOP, to obtain noncompetition agreements and to deliver those agreements to BCOP at or prior to closing. *Id.* With the closing, therefore,

LS&H delivered the Agreements to BCOP.[19]  *Id.*  OfficeMax disputes the Defendants' assertion that Maine law requires a separate written assignment of the Agreements.  *Id.*

OfficeMax turns to the third question—whether it has the right to enforce the Agreements—and pronounces that the answer is "unequivocally yes."  *Id.* at 3. OfficeMax says that the Defendants have misread *Sturtevant.  Id.*  OfficeMax views *Sturtevant* as holding that, to have standing to personally enforce a contract with a corporation, an officer of a dissolved corporation must demonstrate that the corporation assigned the contract to him personally.  *Id.* at 3-4.  OfficeMax disputes the applicability of the survival statute, noting that in a later Maine Superior Court case, *Katahdin Ins. Grp. v. Elwell*, No. Civ.A. CV-00-198, 2001 WL 1736572, at *4-5 (Me. Super. July 9, 2001), the Court refused to apply the *Sturtevant* footnote to a situation similar to the instant case.  *Id.* at 4 n.2.

OfficeMax dismisses the Defendants' complaints about the scope of the noncompetition provision, noting that "greater restrictions have been upheld by state and Federal courts in Maine" and that OfficeMax's request is "coterminous with the geographic location of the customers and prospective customers that Defendants solicited and served for OfficeMax for many years."  *Id.* at 5.

OfficeMax turns to Mr. Levesque's contention that, because he was laid-off, the noncompetition agreement would not apply to him.  OfficeMax rejects Mr.

---

[19] There is no direct evidence that LS&H physically delivered the Agreements to BCOP but it is a fair inference that it did so.  The SPA conditioned the transaction on the delivery of these Agreements.  More significantly, it is not controverted that BCOP physically retained them and when OfficeMax merged with BCOP, OfficeMax physically held the Agreements.

Levesque's prediction that the Maine Supreme Judicial Court would adopt a *per se* rule that would render a noncompetition agreement invalid whenever an employer terminated an employee who was otherwise covered by the agreement. *Id.* at 5-6. To the contrary, OfficeMax says that the Law Court has been concerned with whether the employee, before leaving employment, enjoyed a high level of trust and goodwill with the business's customers and that this alone, according to OfficeMax, has been sufficient in Maine "to support a post-employment, noncompetition agreement." *Id.* at 6.

Finally, as regards the Defendants' view of the Maine Trade Secrets Act, OfficeMax—without further explanation—maintains that the Defendants' contention is "completely wrong." *Id.* at 7.

## II.   DISCUSSION

### A.   Legal Standard

To prevail on a motion for preliminary injunction, the moving party must demonstrate:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). The burden on the moving party "is a heavy one: Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *L.L. Bean,*

*Inc. v. Bank of Am.*, 630 F. Supp. 2d 83, 86 (D. Me. 2009) (internal quotation marks omitted).

### B.      Breach of the Noncompetition Provision

#### 1.      Likelihood of Success on the Merits

"The sine qua non of [the] four-part [preliminary injunction] inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Esso Standard Oil Co.*, 445 F.3d at 18.

On this point, OfficeMax must demonstrate, first, that the Agreements were assigned to OfficeMax via BCOP, its corporate successor, and second, that the Agreements are valid.   The validity of the noncompetition provision of the Agreement turns on the reasonability of the geographic and temporal restrictions and whether these restrictions "sweep no wider than necessary to protect the business interests in issue." *Chapman & Drake v. Harrington*, 545 A.2d 645, 646-47 (Me. 1988).

#### a.      Assignment of the Confidential Information and Noncompetition Agreements to BCOP

"An assignment is an act or manifestation by the owner of a right (the assignor) indicating his intent to transfer that right to another person (the assignee)." *Herzog v. Irace*, 594 A.2d 1106, 1108 (Me. 1991).  "For an assignment to be valid and enforceable . . . the assignor must make clear his intent to relinquish the right to the assignee and must not retain any control over the right assigned or any power of revocation." *Id.*; *accord Sturtevant,* 1999 ME 84, ¶ 11, 732 A.2d at

267.  "A manifestation of intention or a promise to make a transfer in the future is not an assignment."  RESTATEMENT (SECOND) OF CONTRACTS, § 324 (1981).

An effective assignment may be made "without any particular formality."  *Id.*  Indeed, "no particular words are required for an assignment."  *Shiro v. Drew*, 174 F. Supp. 495, 498 (D. Me. 1959).  Rather, an assignment may be effected orally, in writing, or by conduct of the parties.  *Id.* ("[T]he intent to vest in the assignee a present right in the thing assigned must be manifested by some oral or written word or by some conduct signifying a relinquishment of control by the assignor and an appropriation to the assignee.").  The burden rests with OfficeMax to provide proof of assignment by a preponderance of the evidence.  *Sturtevant*, 1999 ME 84, ¶ 10, 732 A.2d at 267.

The Court begins with the SPA.  "As with any written instrument, the intention of the parties controls in determining whether it constitutes an assignment.  And the intention of the parties is to be gathered from the writing construed in light of the subject matter, the motive and purpose of making the agreement, and the object to be consummated, the words used being given their common and ordinary meaning."  *Shiro,* 174 F. Supp. at 498 (internal citations omitted).  OfficeMax points to Sections 2.1, 8.1 and 8.9.  Under the heading "PURCHASE AND SALE OF LS&H SHARES," Section 2.1 provides:

> **Purchase and Sale.**  Seller agrees to and will transfer, assign, and deliver to BCOP at the Closing, and BCOP agrees to and will accept from Seller, on the terms and subject to the conditions and limitations set forth in this Agreement, the LS&H Shares.

*Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for TRO and Prelim. Inj.* at Attach. F,

*STOCK PURCHASE AGREEMENT.* Under the heading, "CONDITIONS PRECEDENT TO CLOSING BY BCOP," Sections 8.1 and 8.9 provide:

> The obligations of BCOP to close under this Agreement are subject to the following conditions precedent:
>
> **8.1 <u>Performance</u>.** Seller shall have performed all obligations required to be performed by Seller pursuant to the provisions of this Agreement which by their terms are to be performed at or prior to Closing, including the delivery to BCOP of all of the documents required to be delivered to BCOP by Seller at or prior to the Closing.
>
> **8.9 <u>Employee Noncompete Covenant</u>.** Prior to Closing, Seller, on behalf of the Company, shall obtain, at BCOP's cost, noncompete agreements in a form to be provided by BCOP with the Company's sales representatives and sales managers who Lewis Snow designated as Employees. In conjunction with each noncompete covenant signed by a sales Employee, Seller shall pay $2,500 for BCOP's account to each such Employee. BCOP shall reimburse Seller at Closing, or if there is no Closing for any reason, on the date that the Closing would have occurred for all amounts paid by Seller to Employees, pursuant to this section, including employer-related taxes.

*SPA.* Section 9.15 is a third relevant provision, under the heading "DELIVERIES BY SELLER":

> At or prior to Closing, Seller will deliver to BCOP, in form and substance satisfactory to BCOP:
>
> **9.15 <u>Employee Noncompete Covenants</u>.** Executed originals of the Employee Noncompete Covenants obtained pursuant to Section 8.9 herein.

*SPA.*

There is no written assignment; the SPA does not explicitly assign the Agreements and OfficeMax has not claimed that a side agreement did so. Nor has OfficeMax asserted that the assignments were conveyed orally. The Court therefore

turns to the third means of assignment: whether the parties assigned the Agreements by their conduct.

The Count finds that both BCOP and LS&H intended to assign the Agreements. *See Katahdin Ins. Grp.*, 2001 WL 1736572, at *4-5 (holding that the language of the purchase agreement "clearly indicates an intent to assign the entirety of the employment contract to [the purchaser]"). The text of the Agreements makes it clear that they were signed in anticipation of BCOP's acquisition of LS&H and for BCOP's benefit. The preamble states:

> I understand that [BCOP] plans to purchase the stock of [LS&H]. I execute this Agreement in contemplation of that transaction, knowing that LS&H is tendering the consideration on behalf of BCOP and intending that my obligations, duties, and promises in this Agreement are for the benefit of BCOP . . . .

Defs.' Ex. 1 at 1. Section 6 additionally provides that "this Agreement shall be freely assignable by LS&H to BCOP in the event of and upon the closing of the sale of stock of LS&H to BCOP." *Id.* at 2. Furthermore, the SPA expressly refers to the Agreements and requires that they be executed and delivered to BCOP as a condition of purchase. These factors suggest that both LS&H and BCOP viewed the assignment as an essential component of the stock sale. *SPA* §§ 8.1, 8.9, 9.15.

Moreover, LS&H and BCOP's actions were consistent with this view. LS&H paid Defendants $2,500 in exchange for the Defendants' execution of the Agreements on February 7, 1996—two days prior to the execution of the SPA. Defs.' Ex. 1 at 2. BCOP later reimbursed LS&H the $2,500 it incurred in obtaining the Agreements. *SPA* § 8.9. LS&H then physically delivered the executed Agreements, and BCOP accepted them. *Id.* § 9.15. There would have been little justification for

BCOP's payment for and possession of the Agreements unless BCOP intended to receive their assignment as part of its purchase of LS&H stock.

In considering the evidence of assignment, the Court is mindful of *Sturtevant*, in which the Maine Supreme Judicial Court affirmed a trial court's finding that no assignment of a snowplowing contract had taken place. 1999 ME 84, ¶ 14, 732 A.2d at 268. There, the Town of Winthrop and M.E.S. Environmental Services, Inc. entered into a contract for snowplowing services. *Id.*, 1999 ME 84, ¶ 3, 732 A.2d at 265-66. Mr. Sturtevant, who was the sole shareholder of M.E.S., later dissolved the corporation. *Id.* 1999 ME 84, ¶ 4, 732 A.2d at 266. When the Town refused to honor the contract, Mr. Sturtevant claimed that when M.E.S. dissolved, he had assigned the snowplowing contract to himself. But he presented no documentation of an assignment and the trial court did not believe him. *Id.*, 1999 ME 84, ¶ 10, 732 A.2d at 267-68. The Law Court held that "[t]he fact that [the plaintiff] continued to plow for the Town for two years after the corporation was dissolved did not compel a finding of an assignment. That fact says nothing about the intent of the corporation to assign the contract." *Id.* at ¶ 10, 732 A.2d at 268.

*Sturtevant* demonstrates that, in the absence of a written or oral assignment, whether an assignment should be found from the conduct of the parties is highly contextual. In *Sturtevant*, the Court simply did not believe Mr. Sturtevant's assertion that he had assigned the contract from his corporation to himself, especially in the absence of any supporting documentation. Here, by contrast, the intent of BCOP and LS&H to assign the Agreements is manifest by the terms of the

SPA and Agreements themselves and by the conduct of the parties both before and after the stock sale.

The Court finds that OfficeMax sustained its burden to demonstrate that LS&H and BCOP assigned the Agreements. *See Pyrofax Gas Corp. v. Consumers Gas Co., Inc.*, 151 Me. 172, 174-75, 116 A.2d 661, 662 (1955) (The defendant's dealings with, and acceptance of gas, equipment and supplies from the plaintiff-assignee "show[ed] conclusively that it assented to and ratified [the assignment]."). Indeed, it would be puzzling if the parties had gone to the trouble of requiring and executing the Agreements, instructing that they were made for the benefit of BCOP, paying Mr. Levesque and Mr. Rattray, arranging for reimbursement of the cost of the Agreements, and physically delivering the Agreements, only to let the matter drop. Because an assignment by conduct is permissible in law, and because the evidence in this case sustains the view that the parties intended and effected an assignment by their actions, the Court finds it likely that OfficeMax will prevail on this point.

### b.    Assignment of the Agreements to OfficeMax

The Defendants assert that OfficeMax has not demonstrated that OfficeMax Contract, Inc., (formerly BCOP) assigned the Agreements to OfficeMax, Inc. when OfficeMax Contract, Inc. and OfficeMax, Inc. merged to form OfficeMax. *Defs.' Br.* at 9. They explain that BCOP changed its name to OfficeMax Contract, Inc. in October 2004, but that OfficeMax Contract, Inc. did not merge with OfficeMax, Inc. until December 2006, and by that time, the Defendants were already employees of OfficeMax, Inc. *Id.* They say that since OfficeMax, Inc., not OfficeMax Contract,

Inc., hired the Defendants, in order to perfect the assignment, OfficeMax Contract, Inc. had to assign the LS&H Agreement before OfficeMax Contract, Inc. merged with OfficeMax, Inc. *Id.*

The Court finds no merit to this argument. As OfficeMax notes, it was BCOP that purchased OfficeMax and, in order to effect the purchase, BCOP changed its name to OfficeMax Contract, Inc. on October 1, 2004. *Pl.'s Reply* at 4; Pl.'s Ex. G. On December 29, 2006, OfficeMax Contract, Inc. merged into OfficeMax, Incorporated. *Pl.'s Reply* at 4; Pl.'s Ex. G. When OfficeMax Contract, Inc. merged with OfficeMax, Inc., the Agreements were transferred to OfficeMax, Inc. Currently, OfficeMax, Inc. possesses nothing less than what OfficeMax Contract, Inc. and OfficeMax, Inc. collectively held at the time of the merger.

### c. Effect of the Merger on the Enforceability of the Agreements

Citing *Sturtevant*, the Defendants assert that OfficeMax cannot sue under the Agreements because LS&H was dissolved more than two years prior to the initiation of the suit. The Court disagrees.

In *Sturtevant*, the Law Court noted in dicta that, even if it had found an assignment of the snow-removal contract, it would not be clear under Maine's survival statute that the plaintiff could have sued on the contracts more than two years after the dissolution of the predecessor corporation. *Sturtevant*, 1999 ME 84, ¶ 11 n.4, 732 A.2d at 267. As the Defendants acknowledge, the statute cited in *Sturtevant*—13A M.R.S.A. § 1122(1)—was repealed and replaced by the Maine Business Corporation Act (MBCA), 13-C M.R.S.A. § 101 *et seq.* Specifically, § 1406

of the MBCA provides that "Dissolution of a corporation does not: . . . [p]revent commencement of a proceeding by or against the corporation in its corporate name." In contrast, under § 1122(1), suit could have previously been brought by an otherwise dissolved corporation only within two years of dissolution. The Defendants argue that the suit cannot be brought under § 1406 because the "subsequent repeal and amendment of the survival statute cannot revive a right long dead." *Defs.' Br.* at 6 n.4. The Court disagrees.

First, the reach of § 1122 was limited to dissolved corporations seeking enforcement of contracts in their name. Here, however, suit is brought not by the now-dissolved LS&H, but by OfficeMax. *See Katahdin Ins. Group*, 2001 WL 1736572, at * 6 (The restrictions of 13-A M.R.S.A. § 1122 do not apply where the successor corporation "is now seeking to enforce agreement on its own behalf").

Furthermore, the Court agrees with the Maine Superior Court's conclusion in *Katahdin Ins. Group* that *Sturtevant's* dicta is inapposite where, as here, there was a valid assignment of the contract to the successor corporation, and where the cause of action accrued after the corporate dissolution. 2001 WL 1736572, at *6 n.3 ("[*Sturtevant*] is inapposite because there was an effective assignment of rights to [the successor corporation]. As well, even if [the predecessor corporation] had dissolved, the survival statute is intended to apply only to claims that accrued before the company dissolved. In the present case, the cause of action accrued four years after [the successor] purchased the assets of [the predecessor]." (internal citation omitted)).

The Court rejects Defendants' argument that the Agreements were made ineffective by LS&H's later dissolution.[20]

### d. Effect of the Layoff on the Enforceability of the Noncompetition Provision

Mr. Levesque, who was terminated by OfficeMax, puts forth the policy-based argument that "an involuntary discharge without cause renders a valid noncompetition agreement otherwise unenforceable."[21] *Defs.' Br.* at 10-12. In support, he refers to an article by Attorney Kenneth J. Vanko in the DePaul Business & Commercial Law Journal entitled "You're Fired!! And Don't Forget Your Non-Compete!," which surveys the legal landscape surrounding noncompetition agreements asserted against terminated employees. *Id.* at 10-11 (citing 1 DePaul Bus. & Comm. L. J. 1 (2002) (*Vanko*)). Mr. Levesque concedes that "the [Maine] Law Court has not yet adopted this position." *Id.* at 11. Even so, relying on the article's logic, he urges the court to "predict, based on prior holdings that noncompetition agreements are contrary to public policy, that the Law Court would hold that an involuntary discharge without cause renders a valid noncompetition agreement otherwise unenforceable." *Id.*

Mr. Levesque is correct in conceding that no Maine case has adopted a rule that prevents a terminated employee from being held to the terms of a noncompetition agreement. Further, even those jurisdictions, which have endorsed

---

[20] The Defendants have not offered a policy reason for their construction of the repealed Maine statute. In this case, LS&H sold its entire book of business to BCOP and once it had done so, there was no reason for its continued existence as a corporation. The Court cannot fathom why the law would require a shell corporation to continue to exist in order for an operating successor corporation to maintain its assigned rights.

[21] This portion of Defendants' argument is relevant to Mr. Levesque only, since Mr. Rattray resigned.

this principle, have not agreed on its application.  Thus, New York adopted a *per se* rule against enforcement for employees terminated without cause, *see Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 397 N.E.2d 358, 361 (N.Y. 1979);[22] Pennsylvania questioned the enforceability for such employees, *see Insulation Corp. of Am. v. Brobston*, 667 A.2d 729, 734-35 (Pa. Super. Ct. 1995);[23] and the Seventh Circuit, interpreting Illinois law, concluded that noncompetition agreements should not be enforced where the employee was terminated without cause and in bad faith, *see Rao v. Rao*, 718 F.2d 219, 224 (7th Cir. 1983).  Other courts have weighed the termination factor in balancing the equities between the employer and employee. *See Econ. Grocery Stores Corp. v. McMenamy*, 290 Mass. 549, 552, 195 N.E. 747, 748-49 (Mass. 1935).

In the absence of guidance from the Maine Legislature and the Maine courts, the Court cannot accurately predict what, if presented with this question, the Maine Supreme Judicial Court would do.  The safer approach is to consider the circumstances of Mr. Levesque's termination as a factor in balancing the relative equities between the parties, but as a federal court, not to attempt to create a new rule of substantive state law.

### e.    Reasonability of the Noncompetition Provision

---

[22] The *Post* case involved a noncompetition agreement that forfeited a former employee's accrued pension benefits if he competed against a former employer who had terminated him without cause—a clause that facially seems unenforceable.  However, the *Post per se* rule has been enforced in New York in less draconian situations.  *See SIFCO Indus., Inc. v. Advanced Plating Techs., Inc.*, 867 F. Supp. 155 (S.D.N.Y. 1994).

[23] Mr. Vanko states that the Pennsylvania rule amounts to a presumption against enforceability for employees terminated without cause.  *Vanko* at 11-14.  The Court is not certain that Pennsylvania has formerly adopted a presumption but agrees that the *Brobston* Court was troubled by an employer, who having determined that the employee was unworthy of continued employment, should be then able to restrict his ability to compete.

The Maine Law Court has emphasized that, because of the potential for post-employment covenants to restrict the former employee's ability to earn a living, "such covenants are contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue." *Chapman & Drake*, 545 A.2d at 646-47 (quoting *Lord v. Lord*, 454 A.2d 830, 834 (Me. 1983) (internal quotation marks omitted)). The reasonability of a noncompetition covenant "must ultimately be determined by the facts developed in each case as to its duration, geographic area and the interests sought to be protected." *Id.* at 647.

The Court considers the enforceability of the noncompetition provision "only as [the employer] has sought to apply it and not as it might have been enforced on its terms." *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995). However, "the party seeking enforcement cannot leave it to the court to enforce only those provisions the court deems reasonable. To do so would require the court to redraft the contract." *Everett J Prescott, Inc.*, 390 F. Supp. 2d 44, 47 (D. Me. 2005). Here, OfficeMax has requested that the Agreement be construed as restricting the Defendants from:

> [e]ither directly or indirectly, soliciting or selling office supplies, office furniture, office technology products, and printer and copier repair services, to the customers and prospective customers of OfficeMax whom [they] solicited and served on behalf of OfficeMax, within the twelve months prior to . . . the date that [their] employment with OfficeMax ended[], where such customers and prospective customers are located within Aroostook County, Maine, or within sixty (60) miles of Aroostook County, Maine.

*Pl.'s Br.* At 16-17. The Court observes that the scope of enforcement that OfficeMax seeks is slightly narrower than the restrictions provided by the plain text of the

noncompetition clause.[24]  Thus, consistent with *Brignull*, the Court considers the provisions of the Agreements that OfficeMax has elected to apply.

In assessing the interests that OfficeMax seeks to protect, the Court notes that "protecting the employer simply from business competition is not a legitimate business interest to be advanced by such an agreement." *Chapman & Drake*, 545 A.2d at 647.  "[A] covenant not to compete may be reasonable, however, when the employee during his term of employment has had substantial contact with his employer's customers and is thereby in a position to take for his own benefit the good will his employer paid him to help develop for the employer's business." *Id.* at 647; *see also Roy v. Bolduc*, 140 Me. 103, 103, 34 A.2d 479, 480-81 (1943) (holding unreasonable a noncompetition agreement where the employer possessed no trade secrets and had imparted no confidential information that could have been used against the employer).

Because the reasonableness inquiry is fact-specific, it is difficult to draw a clear line among the cases. *Compare Chapman & Drake*, 545 A.2d at 648

---

[24] The noncompetition clause provides:

> For a period of 12 months after termination of my employment with LS&H (or for a period of 12 months after a final judgment or injunction enforcing this covenant), I will not, either for my own purposes or as an employee of or for the benefit of any other entity or person in a capacity that directly or indirectly includes responsibility for developing and maintaining customer relationships, engage in the sale or distribution of office supplies, office furniture, or related office products or services, engage in the sale of janitorial supplies, or otherwise engage in the type of work that I presently perform for LS&H within sixty (60) miles of any county in which I performed services for LS&H in the 12 months prior to my termination of employment

Pl.'s Ex. A, *Loring, Short & Harmon, Inc. Confidential Information and Noncompetition Agreement – David Levesque*; Pl.'s Ex. B, *Loring, Short & Harmon, Inc. Confidential Information and Noncompetition Agreement – Dana Rattray*.

(concluding that the absence of any geographic limitation is reasonable since the rest of the covenant is narrowly tailored), *with Walton v. Nalco Chem. Co.*, No. CIV. 99-47-B, 1999 WL 33117055, at *4-5 (D. Me. 1999, Oct. 25, 1999), *aff'd, Order Affirming Recommended Decision of Magistrate, Walton v. Nalco Chem. Co.*, No. CIV. 99-47-B (D. Me. Nov. 11, 1999), ECF No. 20 (holding that a noncompetition agreement lasting 18 months and covering 11 Maine counties was reasonable).

With respect to the temporal restriction, the Agreements provide for a one-year restriction:

> For a period of 12 months after termination of my employment with LS&H (or for a period of 12 months after a final judgment or injunction enforcing this covenant), I will not . . . engage in the sale or distribution of office supplies. . . .

Pl.'s Ex. A. A period of one year from Mr. Levesque's termination would be November 17, 2010 and from Mr. Rattray's termination would be January 25, 2011. However, a period of one year from the date of this Order is November 8, 2011. From the Court's perspective, although the time period is more extended, it is not unreasonable since the Maine Supreme Judicial Court has upheld much longer restrictive covenants. Further, the Defendants have already had the advantage of competing with OfficeMax since last December for Mr. Levesque and since late January for Mr. Rattray. After the Defendants' departure, it took time for OfficeMax to find a new salesperson, and for that person to solidify their relationship with and gain the trust of OfficeMax's customers. It is during this transition period OfficeMax has been most vulnerable to the loss of customer goodwill.

One year is not an excessive amount of time in which to find a salesperson, rebuild customer relationships, and respond to Defendants' competition. *See Walton*, 1999 WL 33117055, at *4-5 ("[A]n eighteen month period permitting Defendant to introduce a new sales person to their existing customers and to maintain the good will between the company and the customers in the eleven county area is reasonable"); *Brignull*, 666 A.2d at 84 (stating that "the trial court's finding that prohibiting Albert from competing within two miles of Brignull's office and within sixteen months after leaving the job was reasonable"); *Sisters of Charity Health Sys., Inc. v. Farrago*, No. CV-07-92, 2010 Me. Super. LEXIS 53, *7 (Me. Super. May 3, 2010) (upholding the reasonableness of a two-year restriction). Indeed, in *Chapman & Drake*, the Maine Supreme Judicial Court affirmed the enforcement of a five year restrictive period. *Chapman & Drake*, 545 A.2d at 648.

Turning to the geographic restriction, OfficeMax seeks to prohibit the Defendants from engaging in the sale of office products "within Aroostook County or within sixty (60) miles outside the border of the County." *Pl.'s Br.* at 6-7. The Court is troubled by the scope of this restriction. Aroostook County is Maine's northern-most and largest county, covering over 6,800 square miles. Not content with Aroostook County alone, OfficeMax seeks to have the noncompetition provision enforced in an additional 60 mile swath bordering Aroostook County. Because of its geography, character, and border, a county-wide restriction has a much more profound impact for a resident of Aroostook County than anywhere else in Maine. Aroostook County borders Canada on its east, north, and northwest and neither Mr.

Levesque nor Mr. Rattray can legally work in Canada. Shaped roughly like an inverted L, the County's population runs only up the middle of the leg of the L and along a portion of its inverted top. The rest of the County is forested. Caribou, where both Mr. Levesque and Mr. Rattray live and work and where OfficeMax's office is located, is approximately two-thirds of the way up the leg of the L. As a practical matter, if the Agreement were enforced as written, in order to meet a customer, Mr. Levesque and Mr. Rattray must travel at least two hours before encountering a potential customer not covered by the Agreement. Once safely outside the restricted area, they would still be in the middle of nowhere. Although there are small towns like Millinocket, Lincoln, and Calais, there is no significant area of population until Bangor, a city about three hours away from Caribou.

Yet, the Defendants worked for OfficeMax or its predecessor, BCOP, for over a decade in their Aroostook County sales area, and in that time had extensive access to OfficeMax's customers and customer lists, and benefited from the goodwill between OfficeMax and those customers. *See Chapman & Drake*, 545 A.2d at 647 (A noncompetition agreement may be reasonable "when the employee during his term of employment has had substantial contact with his employer's customers and is thereby in a position to take for his own benefit the good will his employer paid him to develop for the employer's business."). Moreover, the Court's ruling in *Walton v. Nalco Chemical Co.* counsels in favor of upholding the noncompetition clause. In *Walton*, this Court held reasonable a noncompetition agreement covering 11 Maine counties where the former employee had "substantial contact with customers."

*Walton*, 1999 WL 33117055, at *5. The *Walton* Court observed that, as is the case here, "[t]he very reason why the company included the non-competition covenant in the Associate Agreement was to protect the good will established by the company with its customers should a sales associate leave his or her position." *Walton*, 1999 WL 33117055, at *5 (citing *Brignull*, 666 A.2d at 84). This Court concludes that the geographic restriction, though significant, is not facially unreasonable.

A third factor is the nature of the restricted activity. OfficeMax has requested that the Defendants be enjoined from:

> [e]ither directly or indirectly, soliciting or selling office supplies, office furniture, office technology products, and printer and copier repair services, to the customers and prospective customers of OfficeMax whom [they] solicited and served on behalf of OfficeMax, within the twelve months prior to . . . the date that [their] employment with OfficeMax ended[],

*Pl.'s Br.* At 16-17. OfficeMax is not seeking to prevent the Defendants from employment in County Qwik Print's printing business or, for that matter, in any business, including sales, other than the sale and servicing of office products. *Pl.'s Br.* at 6, 16-17.

While it is true that these Defendants have worked their entire adult lives selling and servicing precisely this type of equipment, OfficeMax's request prohibits the Defendants from selling or servicing office supplies to "those customers whom they solicited and sold such products and services to on behalf of OfficeMax." *Pl.'s Br.* at 6-7. Under this Order, the Defendants remain free to develop new office products customers within Aroostook County. The Defendants remain free to solicit and sell to OfficeMax customers outside Aroostook County and the sixty-mile

swath.[25]  They remain free to solicit and sell to any OfficeMax customers they solicited and served at OfficeMax so long as the solicitations and sales did not occur during the final twelve months of their individual employments with OfficeMax— November 17, 2008 to November 17, 2009 for Mr. Levesque, and January 25, 2009 to January 25, 2010 for Mr. Rattray.  The Court further excludes from this prohibition solicitation of or sales to any OfficeMax customers that OfficeMax diverted to telesales and OfficeMax lost as customers.[26]  Lastly, the Defendants remain free to engage in the same type of printing business that County Qwik Print engaged in while Mr. Levesque was employed at County Qwik Print.  As constrained, the Court does not regard OfficeMax's demand for injunctive relief to be unreasonable.

### f.     Violation of the Agreement's Noncompetition Provision

Having found a likelihood of OfficeMax proving the Agreements to be valid and enforceable, the Court next turns to whether there is a likelihood that OfficeMax can prove a violation.  On this question, the court considers violation of

---

[25] Here, for example, there was evidence that Mr. Rattray and/or Mr. Levesque had dealings with Hamlin Associates in Parkman, Maine and with Millinocket Regional Hospital in Millinocket, Maine.  The Defendants' right to solicit and sell to these and similarly situated customers would not be affected by this Order.

[26] During cross-examination of Mr. Rattray, OfficeMax counsel asked:

Q.  Okay.  An so if - - if the court were to order - - issue an order in this case that potentially did not restrict you and Mr. Levesque from soliciting customers you just referred to, in other words, customers you serviced within the County who, over a period of time, maybe one way or the other, had to go to telesales and your understanding is they were then lost, you would still be able to go pursue those customers, correct?

A. We could . . . .

*Tr.* 288:12-19.

the noncompetition provision separately from violation of the confidential information provision.[27]

The fact that the Defendants have competed directly with OfficeMax within Aroostook County during the restricted period is undeniable. When Levesque was asked if, since June 10, 2010, he had "sold office supplies on behalf of County Qwik Print within Aroostook County, Maine," and if those sales included "customers you dealt with on behalf of OfficeMax, let's say, in 2009," he replied without equivocation, "Yep." *Tr.* 7/2/10, 26:3-6 (playing Excerpt 2 from the Deposition of David Levesque). Similarly, when Rattray was asked about his response to a letter from OfficeMax regarding his alleged violation of the noncompetition provision, he acknowledged that it was "correct" that "even after getting the second letter, [he] didn't stop engaging in the sale of office supplies, office products, office furniture within Aroostook County, Maine." *Tr.* 7/2/10, 28:19-21 (playing Excerpt 1 from the Deposition of Dana Rattray). The Court concludes that OfficeMax is likely to demonstrate the Defendants' violation of the noncompetition provision.

### 2.    Potential for Irreparable Harm

The Court previously expressed some reservations about the extent of the harm OfficeMax would suffer. *Order on Mot. for TRO* at 20. However, given the likely validity and enforceability of the Agreement, the Defendants' admitted competition with OfficeMax, and the additional hearing testimony, the Court finds that OfficeMax has demonstrated the potential for irreparable harm.

---

[27] The Court addresses the latter, *infra* Part II.C, as part of its analysis of the Defendant's alleged violation of the Maine Trade Secret Act.

Although "economic harm in and of itself is not sufficient to constitute irreparable injury," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*. 839 F. Supp. 68, 70 (D. Me. 1993) (citations omitted), OfficeMax's injuries relate most directly to the loss of customer good will—an immeasurable quantity which, once lost, may be difficult to reestablish. *See id.* (stating that a preliminary injunction requires a showing of "the absence of any adequate remedy at law for such injury"). In this respect, OfficeMax was at no time more vulnerable to the loss of customer good will than just after the departure of the Defendants. The fickleness of good will was confirmed by Mr. Rattray, who explained that "business was lost as soon as [Mr. Levesque's customers] heard or knew about the way Dave Levesque had been let go." *Tr.* at 241:1-9.

BCOP's insistence in the SPA of the Defendants' execution of the Agreements makes clear the importance of a recovery period in which an employer can plug the hole left by its employees' departure, and stabilize its relationship with its customers. Based on the evidence at the hearing, the Court accepts that, robbed of the time to plug this hole and rebuild good will, OfficeMax lost sales of customers including Pines Health Center, Hamlin Associates, Smith & Wesson, SAD27, Katahdin Trust, Houlton Regional Hospital, the Presque Isle Area Chamber of Commerce, McCain Foods, and the Houlton School. Pl.'s Ex. C, D, N, P, X, Z-7, Z-10; *Tr.* at 405:17-406:12. The Court is convinced that the potential for irreparable harm warrants the issuance of a preliminary injunction.

### 3.   **Balance of Equities**

The plain text of the Agreement makes it clear that it would last beyond the Defendants' tenure at LS&H. The Defendants cannot now claim surprise at having to abide by the Agreement they freely entered into and for which they were well compensated. To allow the Defendants' continued competition with OfficeMax during the restrictive period would be to give them the benefit of the $2,500 they received without holding them to the reciprocal promises they made. Equity therefore points in favor of the immediate enforcement of the noncompetition provision.

It is true that OfficeMax terminated Mr. Levesque's employment contract and, as noted earlier, this places him in a more sympathetic position than Mr. Rattray who left OfficeMax voluntarily. Given Mr. Levesque's long service to OfficeMax and its predecessors, OfficeMax's handling of his termination seems callous; however, the Agreement does not differentiate between employment terminated with and without cause, and the Court cannot rewrite the Agreements. On balance, this factor alone does not override the others and render the Levesque Agreement unenforceable.

Lastly, as the Court wrote in *Everett J. Prescott, Inc.*, it is "inevitable the enforcement of a non-competition agreement works consequences against the individual that are more human and evocative than the countervailing economic and other consequences against the employer." 383 F. Supp. 2d at 192. This is true here. Like many of their fellow Aroostook County residents, Mr. Levesque and Mr. Rattray are likeable, hard-working men with significant family responsibilities and

all they seek is the right to compete. Yet, as the Court has noted, "if the personal circumstances of the employee were invariably allowed to trump the economic and other consequences to the employer, non-competition agreements would never be enforceable through injunctive relief." *Id.* at 192-93.

### 4. Public Interest

The public interest is difficult to assess. While OfficeMax is a large, national corporation, its small office in Caribou, Maine, is as tied to the local community as is the Defendants' business. Both OfficeMax and County Qwik Print have threatened to close shop if the Court grants the relief the other requests. If these threats are carried out, the effect will be felt by innocent employees, who will lose their jobs because of the inability of the parties to find a middle ground. However, the Court cannot change its ruling under express threats of the parties nor can it pick which threat is more likely to be carried out.

The public has a general interest in competition and, to the extent that the enforcement of restrictive covenants limit competition, this factor weighs against an injunction. Nevertheless, the people and businesses of Aroostook County and elsewhere are entitled to have valid contracts enforced. The Court concludes that this factor remains in equipoise.

### 5. Conclusion – Noncompetition Injunction

Having carefully balanced the four factor test for the issuance of an injunction, the Court concludes that OfficeMax has satisfied its burden and the Court will enjoin activity by the individual defendants that violates the Agreements. The Court declines, however, to enjoin County Qwik Print. County

Qwik Print is not a party to the noncompetition agreements and OfficeMax has not demonstrated that, as a separately organized and operating business, County Qwik Print itself should be subject to an injunction based on Agreements to which it was not a party.

### C. OfficeMax's claimed breach of the Confidentiality Provision and Violation of the Maine Trade Secrets Act

Neither OfficeMax nor the Defendants clearly delineate their arguments regarding the Defendants' alleged breach of the confidentiality provision. The Court presumes that the parties arguments on this point mirror their arguments regarding violation of the Maine Trade Secrets Act (MTSA), 10 M.R.S.A. § 1541 *et seq.*, as both claims rely on the same evidence.[28]

With respect to OfficeMax's claims under the MTSA, the Defendants challenge OfficeMax's request for a preliminary injunction on two points: first, asserting that OfficeMax has failed to adduce proof of violation to warrant a preliminary injunction, *Defs.' Br.* at 12-13, and second, that OfficeMax has failed to

---

[28] The Confidentiality Provision states:

> I understand I may have access to certain confidential information such as: names, addresses, price lists, purchasing histories and requirements of customers and potential customers; location, region, and division financial reports, sales and service manuals and bulletins; item file costs and special contract costs; floor plans and drawings of facilities; marketing strategies; and other similar information. I recognize that such information is the confidential information and trade secrets of LS&H, and I agree to not divulge such confidential information or trade secrets to any person, firm, or institution, except as such disclosure is a necessary part of a bona fide merchandise sale negotiation with an actual or potential LS&H customer. Further, upon termination of my employment with LS&H, I will continue to treat such confidential information and trade secrets as private and privileged and will not, either for my own purposes or as an employee of or for the benefit of any other entity or person, use such information or disclose it to any person, firm, or institution.

Defs.' Ex. 1 at 1.

establish that it has or will suffer from any loss of business, *Id.* at 14-15. The Court concludes that the Defendants are correct on both points.

Before considering whether the Defendants have misappropriated OfficeMax's confidential information or trade secrets, the Court must consider what types of information fall within OfficeMax's allegations. With respect to OfficeMax's confidential information, the Court understands the confidentiality provision to cover:

> names, addresses, price lists, purchasing histories and requirements of customers and potential customers; location, region, and division financial reports, sales and service manuals and bulletins; item file costs and special contract costs; floor plans and drawings of facilities; marketing strategies; and other similar information.

Defs.' Ex. 1 at 1. This definition of "confidential information" sweeps broader than the statutory definition of a "trade secret."

> Under the MTSA, a "trade secret" is defined as "information" that:

> A. Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

> B. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

10 M.R.S.A. § 1542(4).

With these definitions in mind, the Court finds that only a portion of the allegedly misappropriated information may be properly regarded as confidential or a trade secret. OfficeMax has cited its gross profit margin, "its customers, and its sales and pricing strategies" as information that was misappropriated by the Defendants. *Defs.' Br.* at 8-9. However, much of it was already in the public

domain, and was "easily ascertainable" by OfficeMax's competitors. *See Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 924 (Pa. 2002) ("Equity will not protect mere names and addresses easily ascertainable by observation or reference to directories.").

OfficeMax's senior security engineer, Jason Sullivan, admitted that one need look no further than a phone book to seek potential OfficeMax customers. *Tr.* 40:12-24. Moreover, OfficeMax's prices were widely distributed to many of its customers who had no legal duty to keep the information confidential. *Tr.* 129:11-130:6; *see also Ne. Coating Techs., Inc. v. Vacuum Metallurgical Co.*, 684 A.2d 1322, 1234 (Me. 1996) (holding that summary judgment against a former employer was proper because its "unsolicited distribution of the information to various individuals who had no legal duty to maintain its secrecy precludes it from qualifying as a trade secret"). Based on the limited record before it, and the absence of more specific briefing, the Court concludes that of the allegedly misappropriated information, only OfficeMax's profit margins and pricing strategy have been shown to be arguably a secret.

The Court turns to whether OfficeMax is likely to prove that the Defendants used its confidential information or misappropriated its trade secrets.[29] On this,

---

[29] Under the MTSA, "misappropriation" includes:

> B. Disclosure or use of a trade secret of another without express or implied consent by a person who: . . .

> > (2) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

OfficeMax makes much out of the Defendants' purported inability to remember OfficeMax information. *Pl.'s Br.* at 8. This argument misses the mark. The Defendants' recollection of OfficeMax information is relevant only if they actually used the information. There is scant evidence of such use.

OfficeMax points to an email exchange between Rattray and a former OfficeMax customer in which Rattray states that "I can provide the **same services that I offered you in the past**. Our **pricing structure is very aggressive**. Give me a call or drop me a line and I can give you some pricing, I think you will be **pleasantly surprised**." *Pl.'s Br.* at 9 (emphasis in *Pl.'s Br.*). The language strikes the court as nothing more than vague puffery without any reference to specific OfficeMax pricing. Indeed, when pressed on the email's underlying meaning, Mr. Rattray maintained that he was comparing his prices to any generic office supplier—"To Office Depot, to OfficeMax, to Staples, to whoever she was buying supplies from"—and not to OfficeMax in particular. *Tr.* 310:22-25.

Moreover, the value of OfficeMax's confidential information to the Defendants is both speculative and transient. As Mr. Polcaro confirmed, sales information constantly changes. *See Tr.* 41:21-25, 139:15-140:9. Although Mr. Polcaro testified about the Defendants' ability to back-calculate OfficeMax's pricing strategy from its prices and the Defendants' general understanding of the customer

---

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

10 M.R.S.A. § 1542(2).

demands, *see tr.* 140:12-41:21, Mr. Palcaro's testimony is speculative. There is no direct evidence that Defendants used OfficeMax's confidential information to successfully compete against OfficeMax. *See Roy*, 34 A.2d at 480-81 ("[W]hile an employer, under a proper restrictive agreement, can prevent a former employee from using his trade or business secrets, and other confidential knowledge gained in the course of the employment . . . he cannot preclude him from exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment.").

Further, the temporal usefulness of OfficeMax pricing was extremely limited. The Defendants testified that office product pricing is highly volatile and changes monthly, weekly, and sometimes daily. The gap between November 17, 2009, when OfficeMax terminated Mr. Levesque, and late December 2009, when Mr. Levesque first began to compete against OfficeMax, is sufficient to render any confidential information stale. Although the gap for Mr. Rattray was a matter of days, there is insufficient evidence in this record that Mr. Rattray actually used any confidential information to compete against OfficeMax.

In short, OfficeMax has not shown that it is likely that the individual Defendants used OfficeMax confidential information or trade secrets. As a preliminary injunction requires a likelihood of success on the merits, the Court denies a preliminary injunction based on both breach of the confidentiality provision and violation of the MTSA.

## III.   CONCLUSION

The Court hereby GRANTS OfficeMax Incorporated's motion for preliminary injunction (Docket # 6) and DENIES the motion insofar as it seeks to enforce the Confidential Information clause of the Agreement or to enjoin the Defendants on the basis of a violation of the Maine Trade Secrets Act, 10 M.R.S.A. § 1541 *et seq.*

The Court hereby enjoins the individual Defendants as follows:

The Defendants David Levesque and Dana Rattray are prohibited from directly or indirectly soliciting or selling office supplies, office furniture, office technology products, and copier and printer repair services to those customers whom they solicited and sold such products and services to on behalf of OfficeMax during the year before the end of their respective periods of employment with OfficeMax, where such customers are located within Aroostook County or within sixty (60) miles outside the border of Aroostook County. This prohibition does not extend to any former OfficeMax customers that the Defendants serviced during or prior to this one-year interval that OfficeMax diverted into telesales and lost as OfficeMax customers.

This injunction will remain in effect for a period of one year from the date of this Order.

The Court DENIES the Defendants' motions to dismiss. *Defs.' Mot. to Dismiss Pl.'s Compl. for TRO, Injunctive Relief, and Damages* (Docket # 16); *Def.'s*

*Mot. to Dismiss Pl.'s Compl. for TRO, Injunctive Relief, and Damages* (Docket # 17).[30]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 8th day of November, 2010

---

[30] The Court has not separately discussed the merits of the Defendants' motions to dismiss but the opinion discusses each of the legal issues raised in those motions and resolves them against the Defendants. Accordingly, the motions must be denied.